**UNITES STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Tracy Proctor,                                    Case No. 20-CV-2472 (JRT/DTS)

             Plaintiff,              **PLAINTIFF'S MEMORANDUM OF LAW**
                                     **IN SUPPORT OF JUDGMENT ON THE**
                                     **ADMINISTRATIVE RECORD**

vs.

Unum Life Insurance Company of America,

             Defendant.

---

## I) <u>INTRODUCTION</u>

This is an ERISA disability case where Unum paid Proctor LTD benefits for almost a year and a half and then terminated those benefits. Unum wrongfully terminated benefits because "unless information available to an insurer alters in come significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments," <u>McOsker v. Paul Revere Life Ins. Co.</u>, 279 F.3d 586, 598 (8th Cir. 2002), and in this case there was no change, much less a "significant" change, in any of the information available to Unum.

Unum, in its termination, ignored undisputed facts, mischaracterized facts and cherry-picked other facts in order terminate Proctor's LTD benefits. Unum had before it the medical records and reports of Proctor's treating neurologists, neuro-ophthalmologists, neuropsychologist, and numerous therapists <u>all of whom agreed</u> that Proctor was, and continues to be, disabled from her own occupation. There is no evidence in the record that

1

Proctor's medical condition improved or activities changed to justify Unum's termination of benefits. Unum never even analyzed whether Proctor could perform the material and substantial duties of her own occupation given the restrictions and limitations <u>unanimously agreed to</u> by her treating physicians.

The crux of Unum's position is that Proctor's condition did NOT improve, and it alleges it should have, so she is not disabled. Unum has no support in the law or facts to justify this position.

## II)     <u>FACTS</u>

Ms. Proctor is 50 years old; she was employed as a Telephone Supervisor in the Underwriting Department for LTCG, a third-party administrator for insurance claims. On February 26, 2018, she was rear ended by a car going 50 mph. (392-393) The crash was so violent that Ms. Proctor's head cracked the driver's side window. (AR 1909-photo of cracked driver's side window) Ms. Proctor remembers her head hitting the window and immediately feeling dazed. (Id.) She does not recall if she lost consciousness or not, and doesn't remember anything else about the crash. (AR 284)

As a result of the accident, Ms. Proctor sustained a traumatic brain injury as well as neck and back injuries that have resulted in significant physical and cognitive impairments, including post-concussion syndrome, moderate cognitive impairments, visual deficits, vestibular deficits, chronic daily headaches, convergence insufficiency, fatigue and

dizziness/balance issues.  (AR 661-663) These injuries have rendered Ms. Proctor unable to perform the duties of her own occupation and the duties of any occupation.[1]

## A) Defendant's LTD Policy Language.

Defendant's disability policy, under which Ms. Proctor was an insured, provides:

You are disabled when Unum determines that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience. (AR 146)

Material and Substantial Duties means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified. (AR 161)

The policy also provides that the information needed as proof of claim is evidence that the insured is under the care of a physician; documentation of monthly earnings; date the disability began; and the extent of the disability, including "restrictions and limitations preventing you from performing your regular occupation." (AR 134)

The policy also provides that an insured must provide evidence of continuing disability only if requested by Unum.  (Id.)

---

[1] Ms. Proctor's employer was forced to terminate her employment as she was no longer able to perform the duties of her position.  (AR 1897)

### B) <u>Defendant's Vocational Assessment of Proctor's Occupation.</u>

On November 16, 2018, Defendant conducted a vocational analysis of Proctor's occupational duties and found that Call Center Supervisor was most representative of her occupation. This involves daily supervision of a team of call center representatives; overseeing on-floor activities; handling calls those representatives cannot; coaching representatives; recruiting and scheduling staff; keeping records and daily statistics of attendance; and being adept in the duties of call center representatives. (AR 708-709)

The vocational analysis indicated the following duties were required:

Physical/Cognitive Demands
Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 lbs. occasionally.
The duties of this occupation would allow for changes in position for brief periods of time throughout the day.
Occasional reaching and handling.
<u>Frequent fingering.</u>
<u>Constant keyboard use.</u>
<u>Near acuity, far acuity, depth perception and accommodation.</u> (AR 709) (emphasis supplied)

Skilled work involving:
Influencing people in their opinions, attitudes, and judgments.
Making judgments and decisions.
Dealing with people. (Id.)

### C) <u>Proctor's Medical Records and Defendant's Claims Notes Show That She is Disabled--Not Only From Her Own Occupation--But Also From Any Occupation.</u>

#### 1) <u>Medical Records and Reports Support Proctor's Disability</u>

A summary of the medical records that Defendant relied on to find Proctor disabled demonstrate that she sustained serious injuries as a result of the motor vehicle accident (MVA):

4

*2/26/18: Dr. Tallman.  (Day of accident) Seen in urgent care at 9:35 a.m.  Car accident at 7:30 this morning.  "The first symptoms began immediately.  The symptoms from the accident are described as – (headache, from hitting head on the driver's side window and head whipped backwards from the impact.  Also reports stiff neck, upper back/shoulder pain and dizziness). Note for the 'motor vehicle accident': She is feeling really dizzy.  Having a hard time concentrating.  It was hard to fill out paperwork up for…She feels a little nauseous, no vomiting.  Had a hard time focusing on the insurance card when talking to the insurance company.  Vision was blurred."  (AR 355-356) Dx: concussion.

* 3/1/18:  Dr. Tallman.  (3 days post-accident) MVA on 2/26/18 and seen in urgent care that day; whiplash, concussion; headaches and dizziness; neck and back sore; hard to focus; bright lights hurt.  Dx: concussion, dizziness, trapezius strain; symptoms immediate; hit her head on driver's side window and head whipped back.  Dizziness, hard to concentrate; some nausea.  Rest brain, not strain eyes such as computer/phone screens. (AR 353-354)

*3/7/18:  Dr. Hyser (neurologist) Discussed symptoms of closed head injury.  Her job requires a great deal of typing on a computer.  Concussion 10 days ago-rear ended at 50 mph-struck her head and was dazed.  She has headaches, problems with concentration, dizziness, is photosensitive and has neck pain.  Her speech is slow; had great difficulty spelling world backwards; remembered only 1 of 3 objects.  Dx: Concussion with impaired concentration and headaches; referred to physical therapy and head CAT scan. (AR 392-393)

5

*3/8/18:  Dr. Nam Ho.  (family practice) Symptoms neck/shoulder/back pain-moderate to severe; dizziness, nausea, vomiting, light sensitivity.  Dx: cervicalgia; acute bilateral thoracic back pain; acute pain of right shoulder; post-concussion syndrome; off work for 3 weeks. (AR 79-81)

*3/29/18:  Dr. Nam Ho.  Symptoms:  constant headache, feeling foggy, difficulty with word find; trouble focusing, dizziness, nausea.  Referred to concussion clinic and neurology.  Unable to work at this time.  (AR 83-84)

*4/17/18:  Brooke Dokken, PA (neurology) Referred by Dr. Nam Ho.  Rear ended on 2/26/18 at 50 mph-recalls hitting her head and was immediately dazed.  Sx:  daily headaches of 7/10 pain; right eye and posterior head pain and nausea; dizziness and balance problems all the time; difficulty with visual overstimulation; troubles with sleeping; high levels of fatigue; visual complaints including blurred vision, diplopia, eye fatigue, photosensitivity and words jumping off the page.

Cognition:  Difficulty with short term memory, concentration, multitasking, slowed processing speeds and word finding difficulties. Driving is self-limited to nice days and not when fatigued and not during bad weather.  At work uses two computer screens and has difficulty tolerating that.

Dx: (1) "Status post mild traumatic brain injury with symptoms of headache, dizziness, balance deficit, visual overstimulation, sleep impairment, fatigue, probable vision changes, diplopia, photosensitivity, words jumping on the page, photosensitivity and mood changes. (2) Functional cognitive deficits secondary to traumatic brain injury." Agrees to participate in TBI program.

6

Plan:  Headache-try nortriptyline; dizziness:  monitor-will probably improve after visual defects addressed; refer to developmental optometry, clinical psychology, speech language pathology for cognitive rehabilitation and work issues.  Driving-from a brain injury standpoint, can drive but continue to self-limit.  Work:  from a brain injury standpoint not released to return to work.  TBI clinic will manage work ability.  Return to clinic in 1-2 months (AR 661-663)

*4/17/18:  Dokken.  Following in TBI clinic; suffered a mild TBI secondary to MVA; experiencing post-concussive symptoms.  "From a brain injury standpoint, she is NOT released to work at this time."  (emphasis in original) Excuse her from continuing education coursework.  Ability to work will be evaluated in 1 month.  (AR 667-669)

*5/17/18:  Dokken fills out UNUM form.  Limitations: "self-limit physical, emotional and cognitive exertion to prevent symptoms from exacerbation." (AR 69-71)

*5/25/18:  Speech language therapy.  Assessment: "Pt demonstrates moderate cognitive-linguistic deficits c/w mTBI including deficits in verbal fluence/word retrieval per formal cognitive testing.  Severe self-reported deficits in attention, memory, and slowed processing.  Additionally, she presents with functional complaints related to deficits, including severe deficits in headaches, fatigue, sleep disturbances, light/noise sensitivities and mood changes." Minimal improvement in symptoms; constant headaches, moderate to severe.  Not yet appropriate to return to work.  Focus on therapy to improve attention/memory while recovering.  May want to involve neuropsychology if no improvements in symptoms in near future.  (AR 659)

7

*5/31/18: Dokken*. "From a brain injury standpoint, she is NOT released to return to work at this time. She will be seen in clinic in approximately 1 month, and her ability to return to work will be re-evaluated at that time." (AR 654-655) (emphasis in original)

*5/31/18: Dokken* OVN. First seen in TBI clinic on 4/17/18. Last seen by developmental optometry on 4/4/18 and diagnosed with "deficits of pursuits[2], binocular instability[3] with convergence insufficiency,[4] and photosensitivity." Referred to occupational therapy for neurovision rehab and psychology for mood management. Also seen by speech and language for cognitive rehabilitation and work-related issues.

Sx. today: "subtle improvement in intensity of headache pain complaints," but continues to have headaches on a daily basis. Continues with dizziness, poor sleep quality, high levels of fatigue. Continues to report visual difficulties with overstimulation, diplopia, photosensitivity, words jumping on the page. Cognitive: difficulty with short term

---

[2]  Deficits in following or tracking a moving object. https://en.wikipedia.org/wiki/Smooth_pursuit

[3] "Binocular instability is defined as difficulties establishing and maintaining clear and single vision during prolonged visual tasks." "It causes symptoms such as visual fatigue, eye strain, headaches, double vision, blurry vision, moving words, and loss of place when reading, doing computer work, or other near point visual tasks….The condition impacts many adults who have had a concussion or acquired brain injury." www.visioncdl.com/binocularinstability.php

[4] "Convergence insufficiency is a condition in which your eyes are unable to work together when looking at nearby object. This condition causes one eye to turn outward instead of inward with the other eye, creating double or blurred vision." https://www.mayoclinic.org/diseases-conditions/convergence-insufficiency/symptoms-causes/syc-20352735

memory, concentration, multitasking, slow processing speed and word finding difficulties. Assessment:  Same as above (5/25/18 note).

Plan:  mild TBI-continues to be symptomatic.  In early stages of rehabilitative therapies.  "Not an appropriate candidate for return to work at this time given her high symptoms load.  Additionally, discussed how physical pain and fatigue significantly impacts overall cognitive performance." Headache:  try nortriptyline; Dizziness:  monitor, should improve when vision deficits addressed-begin NeuroVision rehab; cognitive: continue with speech therapy. <u>Not released to return to work</u>; follow-up in 1 month.  (AR 649-653)

*6/1/18:  Nicole St. John, OTR/L.  Patient was evaluated by Neuro Optometry and diagnosed with deficits of pursuits, binocular instability, convergence insufficiency, and photosensitivity. <u>Impairments</u>:   demonstrates impairments in sensory functions of pain/pain control; endurance/activity intolerance; <u>Cognition</u>:   attention, memory and processing speed; <u>Visual Perception</u>:  visual attention, visual acuity, ocular motor function, visual processing speed and visual scanning; <u>Visual Processing (neuro)</u> convergence skills and multi-sensory processing/toleration. <u>Limitations</u>:   <u>the above</u> <u>impairments affect</u> <u>patient's ability to safely and independently perform ADL's including bathing, showering,</u> <u>driving, shopping, care of others, child rearing, work/employment.</u>  (AR 691)

*7/2/18:  Dokken OVN. Last seen by developmental optometry on 5/4/18 and dx. with deficits of pursuits, binocular instability with convergence insufficiency and photosensitivity.  Use new prescription glasses, begin neurovision rehab, FU in 2 months.

Still daily headaches, 8-9/10.  Nortriptyline did not help.  Triggers are bright lights and loud noise.  Still difficulty with dizziness and balance; no change in visual, sleep and fatigue.  Cognitive:  continues to note difficulty with short term memory, concentration and processing speeds.  Is doing speech therapy.  Did PT with minimal improvement.  Assessment:  same as above.  Not released to return to work. (AR 597-601)

*7/2/18:  Dokken.  Still experiencing post-concussive sx secondary to MVA; from brain injury standpoint not released to return to work; will re-evaluate in 2 months.  (AR 63)

*9/4/18:  Dokken OVN.  No change in headaches; stop nortriptyline, start amitriptyline.  Still difficulty with dizziness/balance deficit; no improvement in visual complaints, poor sleep, high levels of fatigue and photosensitivity.  Cognitive:  still difficulty with short term memory, concentration and processing speeds.  SLP on hold while focuses on pain and mood management.  Has been doing continuing education for 1-2 hours day as work hardening, but has a difficult time with computer screen tolerance.  Assessment:  same as above. Dizziness/Balance deficit/vision changes:  will complete full vestibular eval with audiology.  Future referral to vestibular physical therapy.  Will continue with continuing education at home; also recommended that she try volunteering to ready herself for future work opportunities.  (AR 866-872)

*9/10/18:  Speech-Language Pathology; Cognitive-Linguistic Evaluation and Treatment Plan.  Assessment: "Pt continues to demonstrate deficits in convergence and presents with moderate binocular instability during daily activities and exercises as observed throughout session.  Working on developing pt's awareness of stability and

peripheral to provide cues and proprioceptive input." Pt demonstrating slow but fairly constant progress. Demonstrated impairments in Visual perception: ocular motor function; convergence/divergence; photophobia; suppression.  These impairments limit her in shopping, cleaning, transportation and reading/computer. (AR 566)

*9/11/18:  Vestibular Testing Report.  Sensory organization testing:  abnormal, multisensory deficit pattern demonstrated.  Ocular Pursuit:  abnormal for right and left eye movements.  Abnormal ocular pursuit suggests possible central vestibular involvement. Posturography (sensory organization) revealed a multisensory deficit pattern.  (AR 850-851)

*9/12/18:  HCMC neurology clinic.  No change in headaches-has daily.  Working with multiple therapies is overwhelming.  Light sensitivity; persistent neck and low back pain.  Also reports memory changes, vision changes, sleep disruption, dizziness/balance. Her symptoms are not improving with time; feels vision and balance are worsening. Discussed that post-concussion sx can be slow to improve but with time and therapy can improve over time.  (AR 554-557)

*10/9/18:  Nicole St. John OTR/L.  Continues to demonstrate binocular instability and convergence deficits.  Increased sx with visual tsks and dizziness.  Still working on goals.  (AR 523)

*11/8/18:  Dokken OVN.  No change in daily headaches—7-10/10.  Continues to note computer screen time and increased activity as triggers.  Still has intermittent dizziness and balance complaints.  Still visual complaints- overstimulation, photosensitivity, words jumping on the page.  Cognitive:  no change of sx of short-term memory difficulties, poor

concentration and processing speeds. Continues to participate in continuing education as work hardening; volunteers as manager on daughter's basketball team.  Primary concern is limited ability to drive given fatigue and visual complaints.  Assessment:  same as above. Plan:  Mild traumatic brain injury-still symptomatic.  From brain injury standpoint, should release her to work reduced hours in some capacity to understand what her limits are. Headache-will continue to FU with neurology.  Dizziness/balance/vision:  will continue with vestibular physical therapy and occupational therapy.  Cognitive:  recommends a complete neuropsychological evaluation to assess cognitive performance.  Released, from a brain injury standpoint, to work up to 2 hours/shifts, 3 days a week and continue with continuing education and volunteering as work hardening.  (AR 793; 797-798)

*11/8/18:  Dokken letter. Workability:  from brain injury standpoint, released to work up to 2 hours/shift, 3 nonconsecutive days/week, with 10 min. breaks every hour. She continues to have headaches, vision problems, neck and back complaints.  These recommendations are subject to her tolerance of the work.  Will be seen in 2 months. (AR 1200-1201)

*11/8/18:  Dokken fills out Unum form.  Unable to perform occupational demands from 2/16/18 to the present due to visual and cognitive demands.  (AR 504-505)

### 2)  Defendant's Claims Notes Recognizes Proctor's Serious Injuries and Restrictions and Limitations.

Defendant's claims notes confirm that Proctor is disabled:

*9/10/18:  Telephone call with claimant.  She can't remember if she lost consciousness.  She remembers her head smashed into the side window, but does "not

really remember what happened." She went to urgent care that day. Treatment includes vestibular therapy, neuro, speech therapy; main provider is Dokken. Did not discuss her activities. (AR 284)

*11/14/18: Dx: mild TBI, headaches, dizziness/imbalance; vision, mood, cognitive; head and neck pain. Per TP Dokken 7/1/18 no work. Phone call with employee on 9/18/18: Her work is all screen/computer work and can't do. Can't follow type-merges together; no better in print. Need to assess functional capacity through EP of 8/16/18. (AR 706-707)

*11/14/18: Vocational Assessment by David Carey VRC. (AR 708-710) (As discussed above)

*11/16/18 & 11/28/18: Clinical analysis by Unum Nurse Kelly Ghidoni. R&L's per provider: no RTW; re-evaluate on 1/2019. Per 11/8/18 letter employee released to RTW up to 2 hrs./shift 3 days/week, nonconsecutive, with 10 min. break every hour. EE to continue with volunteer activity a few days a week as work hardening. Clinical Analysis: Injuries include post-concussion syndrome, neck, thoracic and right shoulder pain; headaches, dizziness, balance issues, photosensitivity, fatigue, ST memory issues, difficulty with concentration and reduced processing speed; seen at urgent care a few hours after MVA.

Does evidence support EE lacks FC for job duties from 2/16/18 to present, and what is duration? Answer: not on basis of neck and thoracic pain. "Yes, on the basis of visual/vestibular deficits in pursuit and binocular instability with convergence insufficiency and associated sxs of dizziness, imbalance and HAs. These deficits are still

13

present when retested in mid-September.  RAC would consist of regular participation in vestibular therapy as recommended and ordered with expectation that EE would return to her prior level of FC with that tx."

"EE was noted to have <u>moderate cognitive-linguistic deficits</u> in the area of verbal fluency/word retrieval when initially evaluated.  <u>Cognitive deficits were also noted by neuro on 3/7/18</u>.  LOV on file with SLP is dated 6/29/18 which reflects EE do [sic] not appear improved next session.  Additional info is needed to assess EE current level of cognitive functioning." "Currently it does not appear EE has any provider opinion R/Ls on the basis of any BH sxs or conditions.  EE is tx with clinical psychologist as part of the TBI treatment team." (emphasis added)

"The TBI program that EE is participating in is actively focused on getting EE back to her prior level of functioning and back to work.  <u>Current activities of course work 1-2 hrs. daily and encouragement to get involved in volunteering as a means of work hardening are very appropriate</u> ….."  Expects EE to improve to prior level of FC within next 2-3 months.  (AR 717-721) (emphasis supplied)

### D) <u>Defendant Determines that Proctor is Disabled from Her Occupation, But Only by Her Visual/Vestibular Deficits.</u>

By letter dated November 28, 2018, Defendant determined that Proctor was disabled and approved LTD benefits effective August 27, 2018.  (AR 724-727) Defendant found that the evidence supported impairment due to symptoms of visual/vestibular deficits.  However, Defendant found that the information did not support impairment due to "neck/thoracic pain, diminished cognition or mental health symptoms.  Any treatment

and/or restrictions/limitations you receive regarding these symptoms will continue to be reviewed."  Defendant referred Proctor to GenEx Services to assist her in applying for Social Security disability benefits--an indication that Defendant believed that Proctor was disabled from "any occupation," which is the Social Security measure of disability.

Defendant's approval letter did <u>not</u> inform Proctor as to why the evidence did not support disability due to cognitive limitations; did <u>not</u> give her notice of her right to appeal its determination that she wasn't disabled due to cognitive limitations; did <u>not</u> inform her what additional information it would need to approve benefits based on cognitive limitations; and completely ignored Proctor's documented chronic daily headaches.

### E) <u>Medical Evidence Continues To Support Proctor's Disability From her Own and Any Occupation Due To Visual/Vestibular Deficits, Cognitive Deficits and Chronic Headaches.</u>

While Defendant paid LTD benefits to Proctor, she continued to receive extensive treatment for her disabilities:

<u>*1/14/19:  HCMC Occupational Therapy</u> (12 visits) Dx:  TBI, binocular instability with convergence insufficiency; impaired ADL's.  Sx a little better but still dizziness, headaches on a scale of 6-8/10; blurry vision, double vision, eye fatigue when reads/uses computer, vertigo, balance problems—losing her place when reading, can't write down her thoughts and unable to concentrate.

<u>Objective</u>:  Rivermead  Post-Concussion  Symptom  Questionnaire:   <u>Severe</u>: headaches, dizziness, nausea/vomiting, fatigue, irritability, depression/tearfulness, frustration, memory impairment, poor concentration, slowed thinking, blurred vision, photosensitivity, double vision, word finding. <u>Moderate</u>:   Photo-sensitivity, sleep

disturbance, restlessness, overstimulation, loss of balance. <u>ADL's</u>:  <u>Bathing</u>: dizzy in the shower; <u>Mobility</u>: difficulty with stairs, trouble with depth perception, goes slow and uses railings; <u>Sleep</u>: 6 hours of sleep, naps during the day 1-2; <u>Medication Management</u>: sometimes forgets to take; <u>Money Management</u>: sometimes misses bills; <u>Driving</u>:  fatigue with long trips, not drive at night, gets flashes of light, loses focus after about 15-20 minutes; <u>Writing</u>:  trouble translating letters from brain to paper-words smush together; <u>Reading</u>:  can only read 2 lines at a time, double vision, words move—can only read 10 minutes at a time; <u>Computer</u>:  worse than reading—took 2 hours to send an email.

"<u>Assessment</u>:  Pt. demonstrating deficits in binocular stability and oculomotor skills including pursuits/saccades today with mild improvement from initial evaluation." Demonstrates impairment in visual perception:  ocular motor function, convergence/ divergence/ambient focal dysfunction.  <u>Impairments limit shopping, cleaning, driving, computer use and reading</u>.  (AR 775-784)

*<u>1/17/19 Neuropsychological Evaluation by Dr. Tupper</u>:  Upon a referral from PA Dokken, Proctor underwent neuropsychological testing with Dr. Tupper on January 17, 2019.  (AR 923-931) The testing confirmed that Proctor had sustained a traumatic brain injury as a result of the MVA, and met the criteria for "moderate cognitive impairment." The test results evidenced "objective neurocognitive dysfunction."  Dr. Tupper observed that Proctor was cooperative and put forth an adequate effort; in addition, the testing was valid and was within normal limits on <u>embedded and stand-alone validity measures</u>.

Dr. Tupper diagnosed Proctor with:

1. SO6.9 Unspecified traumatic intracranial/brain injury (right hemisphere dysfunction);
2. Major neurocognitive disorder due to TBI (consider F02.80 without behavioral disturbance);
3. F43.20 Adjustment disorder, unspecified; and
4. Rule out F43.21 Adjustment disorder with anxiety and depressed mood.

As to ability to work, Dr. Tupper states:

> Ms. Proctor Cisewski, based on the neurocognitive findings (especially her problems with visual organization and memory, processing speed and motor skills), would be expected to struggle significantly in competitive employment settings such as her complex job. She therefore appears at least partially disabled at this time from a cognitive perspective and would need significant tailoring of her job to be successful. Given her additional physical (that is, dizziness, visual problems and fatigue) issues, it is more likely that she should be <u>considered fully disabled presently</u>. (AR 930) (emphasis added)

\* <u>3/14/19 Occupational Therapy</u>: Proctor underwent occupational therapy at HCMC. (AR 1118-1126) In a discharge noted dated March 14, 2019, Dr. Chang's Visual Symptom Survey indicated that Proctor had severe symptoms in blurry vision at a distance; transitioning between near and far; eye fatigue when reading or on computer; headaches when performing visual tasks; losing her place when reading; busy visual environment increases symptoms; sensitivity to light; and difficulty with night driving. Moderate symptoms in blurry vision at near, pressure/pain around eyes; double vision; vertigo/light-headedness; loss of balance/unsteadiness.

The occupational therapy discharge note indicated that Proctor <u>continues to have difficulties with her ADL's</u>, but had made moderate progress in her visual processing skills. While Proctor <u>did not meet many of the PT goals</u>, she was discharged to continue with the therapy exercises at home as her symptoms had "plateaued."

*4/15/19-4/22/19 Vocational Rehabilitation Evaluation Courage Kenny: Proctor also underwent a vocational rehabilitation evaluation at Courage Kenny from April 15, 2019 to April 22, 2019 to determine her ability to work at any occupation and to determine her transferrable skills. The testing was for 4 days, 3 hours a day. (AR 1007-1010) The resulting Vocational Rehabilitation Report dated May 16, 2019 (AR 1837-1845) determined that Proctor was extremely limited in her ability to work and made the following findings:

Transferable Skills:
- Able to record simple telephone messages
- Able to tolerate sitting for one to two hours with option to stand
- Able to follow simple 3-4 step instructions

Vocational Considerations:
- Fatigue and stamina-limited to 2 hours of work activity
- Limited ability to concentrate-brain will 'shut down' after 2 hours
- Computer screen stamina-limited to 20 minutes at one time
- Need for 10-15 minute breaks-dark room resting and cupping eyes
- Has forgotten how to type without looking at keyboard
- Does best with simpler 3 step tasks requiring limited concentration
- Needs to have a task structured for her

Courage Kenny's final opinion was:

At this time, work options appeared very limited. Her abilities might be most successful in a volunteer position. If it were a paid position, it would need to be very simple, low volume, low stress setting with natural lighting and sedentary work conditions, with supportive supervision and where she can handle one task at a time and take breaks as needed. She may need schedule flexibility depending on how she functions and therapy schedules. Also, her physicians have not released her to work. (AR 1844)

*6/4/2019 Dr. Graf (PM&R): "She has been working with Courage Kenny in a re-entry/retraining/return to work program. It was recommended she start

volunteer work 1x/wk x 3 hrs.  She is working with a Children's Cancer Network fundraising.  She feels that it is a low-stress situation that she can do at her own pace."  "She <u>continues to have word-finding difficulties and cognitive slowing.  She is agreeable to return to SLP but would like to see a different provider than she saw last time."</u>  (AR 1292-1294) (emphasis added)

*<u>8/19/19 Dr. Smith (neurology):</u>  Proctor was seen by Dr. Smith for evaluation of her abnormal MRI on referral by PA-C Georgiev.  (AR 1430-1437) Current symptoms include:

- <u>Headaches</u>:  daily 4/10 at best; 9/10 at worst; has daily headaches; sometimes accompanied by nausea; has tried Elavil and gabapentin.

- <u>Dizziness</u>:  gets with and without headaches; off balance; spinning.

- <u>Vision problems</u>:  hard to read and follow what reading-words melt together; it is constant, but worse in bright lights and small print.  The symptoms have not gotten worse or better.

- <u>Memory</u>:  It is not very good.  She forgets things, will lose things, has word finding problems; forgets how to spell words and has difficulty physically writing words.

- <u>Coordination</u>:  mildly impaired on the right; moderately impaired on the left.

Dr. Smith's Assessment:

> From a traumatic brain injury standpoint, the patient has <u>significant abnormalities on exam.</u>  The patient's neglect and visual spatial issues are consistent with her previous neuropsych testing. (AR 1437) (emphasis added)

At this point Unum began contacting Proctor's treating physicians to determine whether she continued to be disabled.  <u>All of Proctor's treating physicians informed Unum that Proctor continued to be disabled</u>:

* Dr. Smith, October 11, 2019:  Not able to perform the duties of her occupation as of February 26, 2018 to the present as "the patient has cognitive difficulties, which limits her critical thinking.  This also greatly impacts her ability to type.  She also has dizziness. Unable to perform frequent fingering, influence people, making judgments."  Unum asked when he expects improvement—Dr. Smith replied "it is uncertain."  (AR 1428-1429)

*Dr. Sealock, December 10, 2019:  "Current Diagnosis:  Convergence insufficiency (H51.11) and TBI;" "Describe current symptoms:  Dizziness, suppression, photophobia, skipping/rereading letters/words.  Poor reading comprehension, and chronic headache." Near vision, with correction, was tested at 20/100 for her right eye and 20/100 for her left eye.  Dr. Sealock noted the following limitations based on his examination:

- Reading:  severe
- Driving:  moderate
- Distance vision:  mild
- Computer/monitor use:  severe
- Performing tasks requiring visual discrimination and depth perception: severe
- Peripheral vision:  mild

Dr. Sealock recommended rehabilitative visual therapy and to decrease triggers until symptoms alleviate.  (AR 1578-1582)

*Dr. Smith, December 11, 2019:   In Dr. Smith's opinion Proctor is unable to perform the duties of her occupation as "she has ongoing daily headaches and cognitive impairment" and will be re-evaluated on January 22, 2020. (AR 1668-1669)

*Dr. Sealock, December 18, 2019*:  Unum again asked Dr. Sealock if, given her near acuity, far acuity, depth perception and accommodation she could perform her occupation; in response, Dr. Sealock noted:

> I have provided copies of multiple office visits.  Tracy has had a long-standing convergence insufficiency or binocular vision disorder.  Tracy has been diagnosed and obtained an outside provider opinion believed to be HCMC and prescribed visual therapy.  On Tracy's initial comprehensive examination since undergoing treatment at HCMC, Tracy was informed the binocular vision disorders appears to be unchanged with a low level of success of her treatment.  I am unaware of HCMC protocol or patient involvement of office/home procedures completed but the underlining binocular vision disorders still remain.  Tracy's history does support a traumatic brain injury resulting in a binocular vision disorder causing symptoms which remain to our last service date.  (AR 1654-1659) (emphasis supplied)[5]

*1/22/20 Dr. Hyser (neurologist)*:  An office note by Dr. Hyser (who replaced Dr. Smith) noted that Proctor's disability continues unchanged.  (AR 1672-1674) She has ongoing symptoms since the concussion; she started on duloxetine, but still has daily headaches; she did trials of amitriptyline, gabapentin and Zoloft which did not work. Currently she has dizziness, like she is in a fog; ongoing issues with her memory—difficulty word finding and putting her thoughts into writing.  Dr. Hyser noted that during her examination she would lose her train of thought as they spoke.  Diagnosis/Impression was post-concussion syndrome from MVA; ongoing daily headaches; OTC overuse-stop

---

[5] Dr. Sealock included an office visit of October 21, 2019 which noted that Proctor had been enrolled in Dr. Chang's Vision Program for about 1.5 years without any progress.  He diagnosed Proctor with convergence insufficiency or TBI with traumatic vision syndrome and recommended further therapy. (AR1444-1445)

ibuprofen; and ongoing cognitive issues.  "<u>I do not think she would be able to work given the above issues and stated so</u>."

### F) <u>Defendant's Continuing Paper Reviews By In House Unum Nurses and Physicians Through Paper Reviews Only</u>.

After approving Proctor's LTD benefits, Defendant continued to collect updated medical records, have phone calls with Proctor and review the claim:

<u>*2/14/19:  Call to EE</u>.  "Headaches are still really bad and dizziness.  Her <u>vision is still a problem</u>, she is still having a lot of trouble with that.  <u>Concentration is bad</u>, when she is reading she will lose track of where the letters are and cannot navigate…the letters and lines will merge.  It is like she cannot pay attention if she is trying to focus on something her eyes cannot focus on it.  <u>It seems to be getting worse not better</u>."  EE asked for return to work assistance-we don't offer until released for at least part-time work.  "<u>DBS reviewed the possibility of volunteer work</u>."  (emphasis added) (AR 937)

<u>*3/13/19:  Claim's note</u>: "EE underwent NP evaluation on 1/17/19 which indicates moderate deficits.  "<u>EE remained supported based on her vestibular symptoms</u>". (AR 960)

<u>*5/15/19:  Call with employee</u>.  Symptoms:  vision, balance, cognitive, headaches, nausea, vestibular therapy—released to do at home—needs strength training.  <u>Vision therapy for over 1 year but stopped because not helping</u>.  Cognitive symptoms: organizing, remembering, easily overwhelmed, must write things down but it is a scribble.  Trouble putting words on paper and finding words-repeats herself.  Visually:  can't track; hard to read; words flow together; can't follow from one line to the next; headaches.  Did

vocational rehabilitation at Courage Kenny-per them not ready to work-they <u>recommended that she volunteer 1 day a week for 3 hours</u>.

    <u>Activities</u>:  needs help at home.  Can't lift/clean.  Dr. Tupper recommended no kitchen unless supervised.  Driving is limited to the daytime when it isn't busy.  For exercise:  bike, treadmill; kicks a soccer ball at home with husband.  Walks the dogs sometimes, goes to kid's games, fills up dishwasher and does laundry with breaks. (AR 971-974)

    <u>*7/10/19:  Paper Review by Unum's  Nurse Gorham</u>.  Cognitively, her own occupation is skilled work.  Is she still impaired?  It is unclear.  "<u>While the record does not document any sustained improvement</u>, it is not clinically reasonable to expect that based on the available description of original injury, that EE would still have this level of ongoing symptoms at approximately a year and a half since the original MVA."  (emphasis supplied) (AR 1336-1340)

    <u>*7/30/19:  Dr. Kouros, Unum, (family medicine) paper review</u>. (AR 1348-1350) Per AP Dr. Graf R&L's return to work 2 hrs. day, 3 days a week and continue classes and volunteer to work harden. Conclusion:  R & L's not supported because:

        -lack of medication side effects; no apparent injury; airbag not employ; not trapped or ejected

        -insured's activities per 5/15/19 phone call exceed occupational demands

        -ability to drive "argues against cognitive impairment"

        -absence of physical findings—"lack of neurologic deficits, musculoskeletal findings, or imaging"

-that AP recommends volunteering, "which is reasonably similar to the outlined occupational demands, argues against ongoing impairment"

-fatigue is "an unmeasurable complaint" and can be caused by "cancer, diabetes, medications sleep apnea…." But opines that in the absence of a specific condition that correlates with fatigue, this cannot be considered impairing.[6]

*9/26/19: Dr. Black Paper review (neuropsychology) (AR 1385-1388) paper review of Dr. Tupper's January 17, 2019 neuropsychological evaluation.  Although Dr. Black admits that there is "no compelling evidence that the cognitive test results are invalid" and that the tests were "abnormal in those cognitive domains requiring visual spatial analysis, organization, construction, and memory" he feels that the neuropsychological test results are "inconsistent with the medical/neurodiagnostic information relating to the MVA and mild concussion, with the expected pattern of improvement following a concussion, and with the EE's activity level."  Dr. Black could not give an opinion as to whether psychological factors affected the test results.

It was Dr. Black's opinion that:

*delayed symptoms are inconsistent with "typical post-concussion" symptoms (he states there was a 7 week delay; however, she reported symptoms the same day at the urgency room and within 3 days at a doctor's visit).

* there is no imaging;

* full remission "is expected" within days to weeks of a MVA; and

---

[6] Fatigue is "one of the most common and debilitating complaints experienced during the recovery process…. It is reported that as many as 98% of people who have experienced a traumatic brain injury have some form of fatigue."  https://www.biausa.org/public-affairs/media/fatigue-after-brain-injury

\* the cognitive results are "inconsistent" with her activities of volunteering, driving and playing bingo.  (Note, the only reference to playing bingo in the record is from the statement of Proctor's long-time friend, Laura Hamman-Peart, who indicated that they <u>used to</u> play bingo together but can no longer do so because Proctor "becomes dizzy, nauseous or headache").  (AR 1905)

\*<u>10/3/19:  Phone call with EE</u>.  Dr. Graf referred her to a speech evaluation; there is <u>not much improvement</u> with the therapies; her <u>vision is worse</u>-she is doing home therapy; symptoms are flashes in and out; she can't drive if it is dark or raining and only short drives; can't maintain concentration; <u>she can only tolerate working on the computer for a short time</u>—the words start to meld together; when she reads she can't follow row to row.  She has headaches, memory problems, can't write down her thoughts and she has dizziness and nausea and exhaustion.  The claims person noted: "<u>was observed during the call that she had difficulty getting thoughts out</u>."

<u>Activities</u>:  rides with husband to take daughter to school, has breakfast and is exhausted and lays down for 1- 2 hours; empties dishwasher, listens to the TV (not watches); goes onto deck with dogs; calls with insurance company; headache-must relax and then has lunch; goes with husband to pick up daughter from school; meditation/exercises for vision therapy or PT therapy; short walk if nice; husband cooks because <u>she has burned her hand a couple of times because she can't judge where she should be looking</u>; husband and daughter do most of the housework; she uses the bike for 30 min. a day.  (AR 1390-1391)

*<u>10/4/19:   Dr. Kouros paper review.</u>   Not precluded from full-time own occupation as she can take short walks, do laundry and use a bike 30 minutes a day.  The neuropsychological testing "did not reflect evidence of cognitive impairment that would preclude the insured from performing the outlined occupational demands." (As a family physician, Dr. Kouros is not qualified to give a neuropsychological/neurological opinion.) (AR 1397-1399)

*<u>10/9/19:  DMO Review Dr. Sergile Paper review (occupational medicine)</u> She agrees with Dr. Kouros—"there are no specific physical findings in the medical reports to support that the claimant would be unable to perform full-time work as outlined above. Although the <u>NP assessment in 1/2019 showed neurocognitive dysfunction</u>, the claimant has subsequently undergone treatment with discharge from therapy.[7]   Additionally, recommended repeated NP assessment has not been performed.  This lack of findings is not supportive of the opinion that the claimant is precluded from full-time work as described."  (AR 1401-1402)

*<u>10/11/19:  Call to EE</u>.  Did Dr. Smith or Dr. Georgiev give you R & L's? Employee said that they didn't talk about work.  EE still has convergence insufficiency-double vision.  Dr.Smith changed the medication for her headaches; <u>her vision is not getting better</u>. (AR 1411-1412)

---

[7] She was discharged from therapy, even though she did not meet her therapy goals, because her symptoms had "plateaued" and she was instructed to continue her therapy exercises at home.  (AR 1126)

*12/5/19:  Dr. Kouros Paper Review-new information:  10/21/19 Dr. Sealock-"AP notes symptoms consistent with TBI with traumatic vison syndrome (DOI 2/26/18) Corrected VA is noted to be 20/100 bilaterally (near) and 20/40 right and 20/30 left (far);" Narrative received from Dr. Smith (neurology) dated 10/14/19 "supporting unable to RTW due to cognitive difficulties."  "Duration:  Based on Forum review, updated information does not provide compelling evidence to support _decrease_ in FC. (AR 1500-1503) (emphasis supplied)

*12/10/19: Dr. Kouros Paper review: Does new medical information—Dr. Smith (neurology) 10/14/19 "Unable to perform occupation demands.  Has cognitive difficulties which limits her critical thinking.  This also greatly impacts her ability to type. She also has dizziness.  Unable to perform frequent fingering, influence people, making judgments." And Dr. Graf (PM&R) 6/4/19 "Released to work up to 2 hours a shift 3 days a week should continue with education course work and volunteer work as a means of work hardening"—change your opinion?  No, based on reported activities, no contemporary physical findings, mechanism of injury and persistence of symptoms.  "The NP testing did not reflect evidence of cognitive impairment that would preclude the insured from performing the outlined occupational demands per NP OSP.  The cognitive difficulties described by Dr. Smith (neurology) in the 8/29/19 office visit do not correspond with prior NP testing."  (AR 1558-1562)

*12/17/19: DMO Dr. Sergile Paper review: (occupational medicine) Agrees with Dr. Kouros; Dr. Smith's 8/19/19 office visit, although noting that coordination is impaired

on the right and left, does not change her opinion. "No specific physical findings or intensification of treatment." (AR 1591-1592)

*12/18/19: Dr. Kouros paper review. Asked if Dr. Sealock 12/10/19 medical changes his opinion on R&L's not supported? Does not change his opinion. "The 10/21/19 office note from Dr. Sealock (Optometry) documented diagnosis of convergence insufficiency with TBI in the left and right eye related to 2/2018 MVA. Was in vision therapy for 1.5 years without progress. Visual acuity OD 20/40 os 20/30." (***note Dr. Kouros omits that near vision was 20/100 bilaterally). Dr. Kouros also cites Yekaterina Georgiev's note of 11/18/19 that "documented no neurologic deficits or other pertinent findings aside from hemorrhoids," but omits the fact that Proctor went to see her specifically for hemorrhoids—not for a neurologic exam. (AR 1597-1601)

*1/14/20: Call with EE. Dr. Smith left and she now sees Dr. Hyser—next appointment on 1/22/20. Dr. Sealock-she is attending vision therapy 2x/week. He says it will get worse before it gets better-may take 6-8 months. PA Georgiev—she deferred to neurologist for R&L's. "She said she continues to have a lot of cognitive issues. Her plan is once she gets thru with the vision therapy and it is under control, she'd like to look into speech therapy. She said she still can't write anything consistently. She said she can visualize what she wants to write, but can't get it down on paper and sometimes she can't say the word." (AR 1630-1631)

*1/23/20: Dr. Kouros Paper review. Dr. Sealock provided office visit notes from 10/21/19, 1/2/20, 1/22/20 and vision therapy notes. Dr. Sealock in 1/22/20 office note states that binocular vision "unchanged" and supports TBI; she has issues with driving,

reading, using computer, visual, depth perception and peripheral. Does this change your opinion?  No.  "The visual conditions/complaints do not correlate with the inability to perform the outlined occupational demands based on acuity testing (20/40) and reported activities." (AR 1663-1664) (**Note, the claims examiner omits the fact that Proctor's near, *corrected* vision, is 20/100 in both eyes.  (AR 1578-1582))

*1/24/20: Dr. Kouros Paper review: New medical from Dr. Hyser-1/22/20 OVN which states unable to perform own occupation-ongoing cluster headaches and cognitive impairment, and also notes that Proctor loses her train of thought when speaking to him. Does this change your opinion?  No- "these findings described by Dr. Hyser are inconsistent with expected improvement after the MVA and it is again noted the cognitive complaints developed 7 weeks after the MVA.  It is also noted the insured's activities including driving, volunteering as a fundraiser, and playing bingo are inconsistent with reported cognitive impairment."  (AR 1675-1676)

*1/27/20 DMO Review Dr. Sergile:  I agree with Dr. Kouros.  "Although the claimant reports having daily headaches, there are no physical findings on examination or functional testing to support that the headaches are not relieved with medication or that the headaches preclude the claimant from performing sedentary work as outlined. Additionally, there are no examination findings, cognitive testing or failure to perform a trial of work to support cognitive impairment that precludes her from performing the outlined occupational demands." (AR 1680-1681) (emphasis added)

## G) **Defendant Terminates Proctor's LTD Benefits**.

On January 29, 2020 Defendant terminated Proctor's LTD benefits. (AR 1689-1697) Defendant did <u>not</u> contend that Proctor's conditions had improved to the point that she could now perform the substantial and material duties of her own occupation. Rather, after accepting the opinions of all of Proctor's treating physicians on November 28, 2018 that she could not perform the duties of her occupation, Defendant now contends that those same opinions are not supported by the record.

Defendant's rationale was that:

- <u>Dr. Hyser's findings are "inconsistent with expected improvement" after the MVA</u>. (AR 1693)

--The fact that some people improve more quickly after a TBI does not refute the fact that the medical records unequivocally demonstrate that Proctor's symptoms have <u>not</u> improved. [8] There is no evidence in the record that Proctor is malingering or her complaints are not credible, nor does Defendant point to any such evidence.

- <u>That "the cognitive complaints developed 7 weeks after the MVA"</u> (Id.)

--This is a total mischaracterization of the record. Proctor was seen in urgent care less than <u>3 hours </u>after the accident, complaining of headache, back/shoulder pain, dizziness, hard time concentrating, nausea and blurred vision, and was diagnosed with a whiplash/concussion. (AR 355-356) She was seen again 3 days after the accident complaining of the same symptoms (AR 353-354) and 10 days after the accident with the

---

[8] "Estimates indicate that between 15% and 30% of persons who experience an mTBI suffer symptoms long after exposure…."
www.liebertpub.com/doi/10.1089/neu.2021.0062

same symptoms. (AR 392-393) Defendant apparently pulled the alleged 7 week delay out
of a hat and continues to rely on this falsity, even though it is unsupported in the record.

- Proctor's "activities as documented above are in excess of the demands required by your occupation."  (AR 1693)

--Proctor's occupation required her to work full-time supervising a team of 18 customer
service representatives and required frequent fingering, "constant keyboard use," near and
far acuity, depth perception and accommodation, influencing people and making
judgments and decisions.  (AR 709) Her "activities" were continuing education courses 1-
2 hrs./day and volunteering 1 day a week for 3 hours. (AR 866-872; 793)

- Proctor's "ability to drive indicates you have the ability to plan, complete visuospatial skills, and demonstrates attention and concentration."  (AR 1693)

--Proctor only takes short drives, during the day-not at night, and only if not fatigued.  (AR
661-65) After 15-10 minutes she loses her focus on driving. (AR 775-784) Of note, her
occupation doesn't require her to drive.

- "There is an absence of recently documented nystagmus or other findings that correspond with impairment due to dizziness.  (AR 1693)

--The records are replete with consistent and continuing complaints of dizziness as recently
as January 22, 2020—one week before Defendant terminated LTD benefits. (AR 1118-
1127; 1430-1437; 1428-1429; 1578-1582; 1672-1674)

- Repeat neuropsychological testing was recommended but hasn't been done.  (AR 1694)

--Neuropsychological testing was done on January 17, 2019 and a re-evaluation was
recommended in 9-12 months or at about the time of Defendant's termination of benefits.
(AR 931) (A neuropsychological re-evaluation was done on August 17, 2020.)

- "[N]o physical findings on examination or functional testing to support that the headaches are <u>not relieved with medication</u> or that the headaches preclude you from performing sedentary work as outlined above."  (AR 1694) (emphasis added)

--The medical records demonstrate that the use of a computer screen, specifically, is a trigger for Proctor's headaches (AR 661) Dr. Smith on August 19, 2019 indicated Proctor has tried Elavil and gabapentin to no avail (AR 1431) and Dr. Hyser indicated on January 22, 2020 that Proctor has tried numerous medications for her headaches, none of which worked. (AR 1672-1674) Apparently Unum failed to read those medical records before providing this rationale.

While Defendant cited restrictions and limitations by Proctor's treating physicians (AR 1690), it <u>omitted a majority</u> of the R&L's imposed by her treating physicians:

- 3/29/18:  Dr. Nam Ho-restricted from all job duties (AR 83-84)

- 4/17/18:  Dokken-restricted from all job duties (AR 667-669)

- 5/17/18:  Dokken-self-limit physical, emotional and cognitive exertion to prevent exacerbation of symptoms.  (AR 69-71)

- 5/28/18:  Speech Language Therapy-not appropriate to return to work (AR 659)

- 5/31/18:  Dokken-restricted from all job duties due to TBI (AR 654-655)

- 6/1/18:  Occupational Therapy-limitations and impairment in ADL's of bathing, showering, driving and work.  (AR 691)

- 7/2/18:  Dokken-restricted from all job duties due to TBI. (AR 63)

- 9/18/18:  Speech Language Therapy-impairments limit ADL's of shopping, cleaning, transportation and reading/computer use.  (AR 562-568)

- 11/8/18:  Dokken-released to return to work 2 hrs./day 3 non-consecutive days/week.  (AR792-798); Cannot return to work. (AR 504-505)

- 1/14/19:  Occupational Therapy-limited in shopping, driving, computer use and reading.  (AR 775-784)

- 1/17/19:  Dr. Tupper-considered fully disabled at present.  (AR 930)

- 3/14/19:  Dr. Chang-Defendant states he did not provide any R&L's, but omits his findings of blurry vision; eye fatigue on computer or reading; headaches with visual tasks; losing her place when reading; blurry vision; double vision; vertigo/light headedness; loss of balance/unsteadiness.  (AR 1118-1127)

Defendant's most glaring omission, however, is its complete disregard of arguably the most objective measurement of Proctor's abilities that was performed during a 4-day vocational rehabilitation evaluation at Courage Kenny on April 15 to April 22, 2019.  (AR 1007-1010) That evaluation found that Proctor was not only unable to perform the duties of her own occupation, she could not perform the duties of any occupation, as she can only tolerate sitting for 1-2 hours in a day with the option to stand; she is limited to 2 hours of work activity a day; she can only concentrate for 2 hours at a time; she is limited to 20 minutes of computer screen at a time.  The evaluation found that her work options were "very limited" and her best bet would be a volunteer position.  (AR 1844)

### H) Proctor Appeals the Termination of LTD Benefits.

On September 23, 2020, Proctor administratively appealed Defendant's termination of LTD benefits.  (AR 1771-1792; Exhibits 1822-1910) Proctor provided a photograph of the driver's side window showing it was cracked by the velocity of Proctor's head hitting the window.  (AR 1909) Proctor also provided Defendant with new medical records that continue to confirm that Proctor is unable to perform the substantial and material duties of her own or any occupation:

- <u>Dr. Tupper Neuropsychological Re-Evaluation on August 4 and 6, 2020</u>. (AR 1826-1830)

Ms. Proctor's current symptoms include headaches, visual and depth perception problems, poor ability to type and write, variable cognitive and memory skills, and is overwhelmed easily.  She is also stressed as her LTD benefits were terminated.

The re-evaluation again demonstrated "moderate cognitive dysfunction," with greater levels of impairment in "complex attention, psychomotor speed, nonverbal processing, memory" domains due to TBI-based cognitive dysfunction.  "Cognitively, Ms. Proctor demonstrates borderline immediate auditory attention which is slightly reduced over time, and shows severely impaired visual and complex attention presently, which is notably reduced compared to 2019."  Although cognitive decline over time is not common, Dr. Tupper attributed the decline to more psychiatric disability due to "reported insurance based stress" and/or her "continuing cognitive difficulties."  (AR 1829)

Dr. Tupper found that Proctor provided adequate cooperation and effort and <u>passed the test's validity measures</u>.  Dr. Tupper did observe decreased word retrieval and disorientation when interviewed.   Dr. Tupper concluded that Proctor "is showing greater functional disturbance for everyday functioning at this time in her recovery" and that she is <u>not </u>presently "capable of return to work."  Dr. Tupper recommended a "multifaceted rehabilitation program serving her medical/physical, cognitive (visual) and psychoemotional needs."  <u>He again strongly recommended a formal driving evaluation</u>. (AR 1930)

- <u>6/24/20: Dr. Hyser (neurologist):</u>  (AR 1832)

Dr. Hyser states: "Ms. Proctor sustained a concussion in a motor vehicle accident on 2/26/18. As a result of this concussion she has had ongoing post-concussion symptoms which include headaches, impaired memory/cognition, dizziness/vestibular deficits, and impaired vision. These symptoms continue to impact her on a daily basis. She remains disabled from her employment as a Call Center Supervisor."

- 8/28/20: Dr. Sealock (optometry).   (AR 1834-1835)

Proctor has "long-standing convergence insufficiency or binocular vision disorder." Her vision disorder is <u>unchanged</u>, and she hasn't had much success with her treatment. "Tracy's history does support a traumatic brain injury resulting in a binocular disorder causing symptoms which remain to our last service date," and Dr. Sealock recommended 24-32 therapy sessions.

As part of the administrative record Proctor provided Defendant with her own statement and statements from her husband, Paul Cisewski, and her long-time friend, Laura Hamman-Peart:

- Statement of Tracy Proctor (6/2/20) (AR 1900-1901):

Tracy gave examples of how her symptoms impact her on a daily basis. Due to her impaired depth perception, she has trouble with stairs; has burned herself cooking, with a hair straightener and a lighter. She has trouble with word finding, spelling, math and writing-it is hard to put her thoughts on paper. Driving is a problem—she can only drive short distances, only in the daytime, and not in bad weather. She has trouble using the computer—typing requires extreme effort and she needs help with emails.

- Statement of Paul Cisewski (4/7/20) (AR 1903)

35

Mr. Cisewski has had to take over most of the driving duties; her vision limits her typing and it is difficult for her to read her phone.  He needs to help her on the computer.  Her frequent headaches limit their social lives, and she is depressed and sleeps a great deal.  Tracy also has memory issues, forgets thing they have talked about and needs reminders.

- Statement of Laura Hamman-Peart (4/22/20)  (AR 1905-1906)

Ms. Hamman-Peart has been friends with Ms. Proctor since the 8th grade.  She knew Tracy as a "competent, confident, self-sufficient person" who excelled in her work. Since the accident Ms. Proctor is unable to do even simple tasks without extreme effort.  This has resulted in her being frustrated, anxious, depressed, and lacking confidence.

Ms. Hamman-Peart has observed that Tracy's handwriting has changed—it now looks like a child's.  She has a hard time texting and reading—she has to squint her eyes to try and focus.  Tracy also has a hard time with depth perception---she has observed Tracy's inability to gauge steps or ground that is not level.  Tracy's memory is poor-she asks the same questions multiple times and doesn't remember the answers.  Now Tracy must avoid areas with noise or lights-it makes her nauseous and dizzy.

She and Tracy used to do things together such as Bingo, shopping and trivia but can no longer do these activities because Tracy gets dizzy and has headaches.  Tracy used to come up to Ms. Hamman-Peart's cabin during the summers but cannot do that unless someone else drives her.  They used to play board games together but can no longer play games that require writing or drawing which is difficult for Tracy.

Ms. Hamman-Peart has also had to accompany Tracy to doctor's visits to assist her in filling out paperwork, and to speak to the doctor because Tracy's memory is bad and she has a hard time expressing herself.

Defendant's response to these statements:  crickets.

### I)  **Defendant Upholds the Termination of LTD Benefits.**

On November 17, 2020, Defendant upheld the termination of LTD benefits.  (AR 1995-2003) In a claims entry dated 10/5/20, Phaen Stone, Appeals Specialist, went over Proctor's medical history, vocational demands, and confirmed that all of Proctor's treating physicians have opined that she cannot perform the duties of her occupation: Dr. Smith (neurologist) on 10/15/19; Dr. Hyser (neurologist) on 1/22/20; Dr. Sealock (optometry) on 12/11/19; and Dr. Graft (PM&R) on 7/16/19.  Mr. Stone omitted the fact that Dr. Tupper, on 1/17/19 and 8/28/20 also opined that Proctor was disabled from work, and also omitted the conclusion of Courage Kenny on 5/16/19 that Proctor was disabled from her own and any occupation. (AR 1843-1844)

Defendant begins by misstating the record.  It states that "over time" Proctor reported symptoms.[9]  However, the record shows that Proctor "immediately" experienced symptoms less than 2 hours after the accident including headaches, dizziness, trouble concentrating and filling out paperwork, trouble focusing, nausea and blurred vision.  (Dr. Tillman, 2/26/18, AR 355) She related the same symptoms to Dr. Tillman 3 days later on 3/1/18 (AR 353) and to Dr. Hyser on 3/8/18 (AR 392-393).

---

[9] Apparently Defendant has now dropped the fiction that Proctor did not report any neurological symptoms until 7 weeks past MVA.

Defendant admits that in 2018 her employer terminated her employment as she was unable to perform the duties of her position, but then states that Proctor "continued to successfully take course work" and "engaged in volunteer efforts."  What Defendant omits is that the coursework was for 1-2 hours a day (AR 868), the volunteer efforts were 1 day a week for 3 hours (AR 1293), and Defendant's claim's examiner felt that volunteer work was "very appropriate."  (AR 720)

Defendant notes that Ms. Dokken released Proctor to return to work 2 hrs./day, 3 days a week in November of 2018, but states that "Ms. Proctor did not return to work and expressed fear of symptom exacerbation" omitting the fact that there was no job to return to as she had already been terminated, and that in the same medical record Ms. Dokken states that Proctor is unable to do her job as a result of visual and cognitive impairments. (AR 504-505)

Defendant states that Dr. Chang in March of 2019 stated that Proctor's vision deficits had "largely resolved" and her convergence had improved.  However, Defendant omits the occupational therapy discharge summary of 3/14/19 which lists a Visual Symptom Survey done by Dr. Chang and which found the following symptoms to be "severe:" blurry vision, difficulty transitioning between near and far, fatigue/eye tired when read/computer, headache with visual tasks, losing place when reading, busy environments or motion increases symptoms, sensitivity to light and difficulty with nighttime driving. The assessment was that Proctor had made "moderate progress," but had not met the therapy goals.  As her symptoms had "plateaued," she was discharged to do therapy exercises at home.  (AR 1118-1126)

Defendant relied on a paper review by an Unum in-house physician, Dr. Crawford. (AR 1970-1975)  Defendant's rationale for upholding the termination of LTD benefits was:

*Cognitive impairment due to traumatic brain injury:  In a majority of patients with a mild traumatic brain injury, symptoms resolve within 3 months (AR 1998) and her symptoms are "inconsistent with the typical/expected trajectory after a mild TBI." [10] However, Defendant does not point to any evidence in the record that Proctor is malingering or her complaints are not credible.  Nor does Defendant point to the records of any treating physicians opining that.

Defendant admits that Dr. Tupper's neuropsychological testing in 2019 and 2020 found moderate cognitive dysfunction, but states that such testing requires "effort and cooperation on the part of the subject" and the "exam did not include robust validity/consistency measures."  Dr. Tupper's reports found that Proctor "put forth adequate cooperation and effort, and normal performance validity findings."  (AR 926; 1828) Neither Defendant's letter nor Dr. Crawford's review states which validity tests were not done that should have been done, or what validity measures it considers "robust" enough.

Defendant states that Dr. Tupper's 2020 neuropsychological exam noted that "psychiatric disorders were causing a decline in her cognitive performance;" however, it

---

[10] "A widely cited figure in the literature suggests that only 15% of first-time concussed individuals will go on to experience persistent PCS [persistent concussive symptoms] and concomitant long-term cognitive impairment….our findings suggest that this number is likely a gross underestimation at least in relation to cognitive impairment and should be carefully examined in future prospective, longitudinal studies." www.ncbi.nlm.nih.gov/pmc/articles/PMC5388340/

failed to note that Dr. Tupper felt that Defendant's termination of LTD benefits and the stress of living with cognitive deficits contributed to Proctor's decline in performance. (AR 1829)

Defendant states that Proctor is not cognitively impaired as she can drive and volunteer. (AR 1998)   Defendant fails to note that Proctor does limited driving, only during the day, not when it is busy, not when she is fatigued, can only focus on driving for about 15-20 minutes (AR 661-665; 775-884) and that her volunteering is limited to 1 day a week for 3 hours. (AR 1293)

*Vestibular/Dizziness:  Defendant states that walking 30-60 minutes a day or using a stationary bike 30 minutes is "inconsistent" with a claim of vestibular dysfunction, and that physical therapy had noted Proctor was ready for discharge. (AR 1999) First, walking is not a substantial and material duty of Proctor's job. Second, Courage Kenny's vocational evaluation in April of 2019 documented dizziness after 20 minutes when Proctor worked on a computer. (AR 1837-1845) This is also contrary to the records of Proctor's treating physicians, who documented continuing symptoms of dizziness: Dr. Hyser on 6/24/20 (AR 1832) and on 1/22/20 (AR 1672-1674) and Dr. Sealock on 8/28/20 who noted dizziness and was providing twice weekly therapy for that. (AR 1834-1835)

*Visual Deficits:  Defendant states that in March of 2019 Dr. Chang found "significant clinical improvements," and must be referring to the 3/14/19 progress note of Dr. Chang. (AR 1112-1115) What Defendant fails to note is that Dr. Chang wanted Proctor to get a second opinion from a developmental optometrist. (AR 1114) Proctor did go to Dr. Sealock for a second opinion, and Dr. Sealock did not find that her visual deficits had

improved; in fact, Proctor began a long session of visual therapy with Dr. Sealock.  (AR 1578-1582; 1654-1659)

In addition, on the same day as Dr. Chang's report, the occupational therapist, Nicole St. John, found that Proctor had made "moderate progress" in visual deficits, but that she had not met the therapy goals and since her symptoms had plateaued, she was discharged to continue therapy at home. (AR 1126) The therapist also noted that Proctor "continues to have difficulties with her ADL's…." (1119-1121) Lastly, Proctor's visual deficits were very apparent during her vocational rehabilitation evaluation at Courage Kenny in April of 2019.  (AR 1837-1845)

\*<u>Headaches and neck/back pain</u>:  Defendant makes short shrift of Proctor's chronic headaches, stating that the last time she had treatment for them was with Dr. Teague in September of 2018. (AR 1999) Defendant again misstates the record.   Proctor had continuing treatment with her neurologists Dr. Smith and Dr. Hyser, trying various prescription medications in an attempt to alleviate her headaches.  (AR 1431;1437; 1672-1673) The evaluation at Courage Kenny in April of 2019 also documented that reading and computer use for 15-20 minutes brought on headaches and visual distortion.  (AR 1844)

Although Defendant included boiler plate language that it "considered all symptoms/conditions both individually and collectively" (AR 2001), a review of the denial on appeal and Dr. Crawford's paper review make clear that Defendant <u>only</u> considered whether each individual condition was disabling—it never even attempted to determine whether a combination of all of Proctor's conditions rendered her unable to perform the substantial and material duties of her own or any occupation.  In fact, <u>Defendant never</u>

analyzed whether Proctor could perform the duties of her occupation with her reported symptoms, limitations and restrictions.

### III)   STANDARD FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The parties have filed cross-motions for judgment on the administrative record, pursuant to Fed. R. Civ. Pro. 39(a)(1) and 52(a)(1).  The parties have stipulated that the standard of review is *de novo* and that the evidence to be relied on is the Defendant's administrative record, in addition to public reference materials and excerpts from the Defendant's claim manual.  (Exhibit A-Stipulation)

In Avenoso v. Reliance Standard Life Ins. Co., _____F.4th_____, 2021 WL 5570816 (8th Cir. Nov. 30, 2021) the parties filed cross-motions for summary judgment in an ERISA case.   As the standard of review was *de novo,* and the evidence consisted of the administrative record, the trial court weighed the evidence and made credibility determinations. The 8th Circuit discussed the conundrum that faces these ERISA cases where the standard of review is *de novo* and judgment will be made on the administrative record.  While it held that the trial court erred in treating the summary judgment like a bench trial, it held that the error was harmless:

> In this case, each party confirmed at oral argument that is has no additional evidence to submit in the event that we remand for a bench trial.  Thus, if we were to remand, then the district court would do in a bench trial exactly what it did already: decide the case on the administrative record without giving either side the benefit of all reasonable inferences but instead weighing the evidence and finding the facts.  On appeal we would 'review the [district] court's factfinding for clear error and its legal conclusions de novo.'  *Koons,* 367 F.3d at 774.  (Avenoso at *8)

The court then directed that parties who wish to have an ERISA case decided on the administrative record should ask the trial court to proceed under Fed. R. Civ. Pro. 39(b) and 52(a)(1).  Avenoso at *4.

That is what was done in Chapman v. Unum Life Ins. Co. of America, 2021 WL 3667345 (D. Minn. Aug. 18, 2021).  That was an ERISA disability case, as is the instant case.  The parties filed cross-motions for summary judgment but then stipulated that the Court was to determine, de novo, whether plaintiff met her burden by a preponderance of the evidence.  Id. at *1.  The court then determined the motions *de novo* based on the administrative record.  Thus, in this case the parties request the Court to make a *de novo* determination on the administrative record.

## IV)   ARGUMENTS AND AUTHORITIES

### A) Defendant Acted As Proctor's Adversary, Rather Than as a Fiduciary, When Evaluating This Claim.

Defendant is a fiduciary vis-à-vis Proctor and must "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries…" 29 U.S.C. §1104(a)(1).  This statute, and the case law interpreting it, impose an "…unwavering duty on an ERISA trustee to make decisions with single-minded devotion to a plan's participants and beneficiaries…"  Berlin v. Mich. Bell Tel. Co., 858 F.2d 1154, 1162 (6th Cir. 1988).  Moreover, the courts have further amplified and articulated this duty to stress its requirement of extreme fairness to claimants:

> It [an insurer/fiduciary] cannot simply act as a self-interested party that need only avoid violating the legal floor created by the covenant of good faith and fair dealing.  It must reach much higher; it must act with the very punctilio of fairness.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1101 (9th Cir. 1999)

43

Defendant failed to fulfill its fiduciary duties to Proctor.  In reviewing the claim, Defendant misstated the medical evidence, omitted and ignored crucial evidence that supported Proctor's claim, and just combed the record for evidence to support its termination of LTD benefits, rather than making a good faith effort to evaluate all of the evidence, for and against, and come to a fair and balanced decision.  Halpin v. W.W. Grainger, 962 F.2d 685, 695 (7th Cir. 1992).

An insurer/fiduciary abuses its discretion when it "ignores relevant evidence", "arbitrarily refuses to credit a claimant's reliable evidence, including the opinions of a treating physician" and "[combs] the record for evidence in its favor and abandoning its review upon discovering 'more than a scintilla' of such evidence."  Willcox v. Liberty Life Assurance Co, of Boston, 552 F.3d 693, 701-702 (8th Cir. 2009)

**B) The Record Conclusively Establishes That There Was No Significant Change in Proctor's Medical Conditions or Activities to Support a Termination of Benefits.**

When Defendant approved LTD benefits, it relied on evidence collected from February 26, 2018 to November 8, 2018: Proctor's medical records from February 26, 2018, the day of the accident through November 8, 2018, phone calls with Proctor, and paper reviews by in-house medical personnel.  Defendant knew that all of Proctor's treating physicians found that Proctor was disabled from her own occupation due to a traumatic

brain injury sustained in the accident, which resulted in a moderate cognitive impairment, visual deficits, vestibular deficits, chronic headaches and neck/back pain.

As of the date of approval of benefits, Defendant was aware that Proctor could do limited driving, volunteered on a limited basis, walked/biked 30-60 minutes a day, kicked a soccer ball with her husband, walked the dog, went to her kid's sports games and did some light chores. The record collected after Defendant's approval of benefits shows that Proctor's activities had not changed—they had remained the same as before the approval of benefits.

An insurer that approves LTD benefits cannot then terminate benefits based on substantially the same evidence on which it granted benefits. The seminal case is <u>McOsker v. Paul Revere Life Ins. Co.</u>, 279 F.3d 586 (8th Cir. 2002). In that case the defendant granted LTD benefits and two years later terminated benefits after plaintiff's treating physician opined that plaintiff could return to work. The court noted that while an insurer can terminate benefits, it must show a "significant" change in the information available to it:

> [U]nless information available to an insurer alters in some **significant** way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments. (<u>Id.</u>, at 589) (emphasis supplied)

The court also stated: "[I]t is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them. *See, Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001)" <u>McOsker</u> at 590.

In <u>Walke</u>, the court reversed a termination of previously granted benefits, stating:

Nothing in the claims record justified Reliance's decision that a change of circumstances warranted termination of the benefits it initially granted. The only change was that Walke resigned from the stressful position that had disabled him. There was no evidence that he recovered the ability to perform that job…." Id. at 840-841.

Where an insurer terminates benefits based on a change in the plaintiff's activities, courts routinely hold that where the insurer was already aware of those activities, it does not constitute a "substantial change" and there is no basis to terminate benefits. Morgan v. Unum Life Ins. Co. of America, 346 F.3d 1173, 1177-1178 (8th Cir. 2003).

A new paper review does not constitute a "significant change" in the information available to an insurer to justify a termination of benefits. In Ripka v. Hartford Life and Acc. Ins. Co., 2012 WL 1110573 (D. Minn. Apr. 3, 2012) defendant paid benefits for years and then terminated benefits, arguing that 2 independent (not in-house) paper reviews constituted a change in the information available to it. Judge Davis disagreed, as the new evidence did not show that plaintiff's condition had changed or improved.

Similarly, in Werb v. ReliaStar Life Ins. Co., 2014 WL 2881468 (D. Minn. June 25, 2014), Judge Schlitz held that the termination of benefits based upon 3 new paper reviews was an abuse of discretion where they weren't based on any new medical records that showed an improvement in plaintiff's condition:

ReliaStar contends that, after it initially found Werb to be disabled, the information available to it altered significantly because it obtained Werb's updated medical records. This cannot be true, however, because the updated medical records do not show any change in Werb's condition nor shed any light on its nature. (Id. at *8)

More importantly, none of the reviewers rely on the new medical records to opine that Werb is not disabled, nor do they attempt to reconcile their opinions with ReliaStar's initial finding of disability. For example, the

46

reviewers do not opine that the new records demonstrate any change in Werb's condition, reveal that Werb had been misdiagnosed, or provide a fuller picture of a condition that was previously only imperfectly understood. (Id. at *9)

More recently, in Kaminski v. Unum Life Ins. Co. of America, 517 F. Supp. 3d 825 (D. Minn. 2021) the defendant approved and paid short-term disability benefits for the maximum duration.  When plaintiff applied for LTD benefits, however, the claim was denied on the basis that the plaintiff was not disabled.  Judge Nelson relied on the fact that the definitions of disabled under the short-term disability plan and the long-term disability plan were the same, and the medical records that the defendant relied on to approve short-term disability benefits were the same medical records that it relied on to deny long-term disability benefits.  The court held:

> "Unum's prior approval of Plaintiff's STD claim, under the same definition of 'disability' as the LTD policy, with no evidence showing a significant change in Kaminski's condition or in the medical records for review, 'weigh[s] against the propriety of [Unum's] decision to deny LTD benefits. *McOsker*, 279 F.3d at 589."

The court also took issue with defendant's statements that plaintiff's activities of swimming, walking the dogs biking, traveling and driving were "inconsistent" with his claimed disability.  As plaintiff's occupation was sedentary, his ability to do these activities were irrelevant to his ability to perform his sedentary occupation.  Kaminsky at 863-864. The court also did not give much weight to the opinions of defendant's paper reviewers because, to the extent that the symptoms are subjective, "courts have observed that assessing pain or other conditions with subjective symptoms may be best informed by physicians who see the claimant regularly and make in-person observations." (citations

omitted) (Id. at 862) The court also found it was "telling that none of Unum's medical reviewers interviewed or examined Kaminski in connection with his LTD claim, nor did they schedule an IME." (Id. at 863).

In this case, the new medical information Defendant received between the time it granted benefits on November 28, 2018, and the time it terminated benefits on January 20, 2020 did not show that Proctor's medical conditions had improved—to the contrary, the new medical records confirmed that her disabling conditions either remained the same or worsened. Defendant's own paper review by Nurse Gorham on June 10, 2019 admitted that the new medical records "does not document any sustained improvement." (AR 1336-1340). The paper reviews by Dr. Kouros opined that Proctor was no longer disabled because she could drive, volunteer, take short walks, do laundry and bike 30 minutes a day – which are the same activities she had been doing when benefits were approved.

In a forum on December 5, 2019, Defendant found no disability as the updated information did not provide "compelling evidence to support a *decrease* in functional capacity. (AR 1500-1503) Defendant has to show that Proctor's functional capacity improved from when benefits were approved, not decreased. The crux of Defendant's paper reviews are that Proctor's conditions did not improve, and it posits that in most cases, symptoms should improve. But that is not the standard for terminating benefits—that because some people improve, and Proctor did not, she is not disabled. The standard is "significant" evidence that Proctor's conditions had improved.

In Chapman v. Unum Life Ins. Co. of America, ____ F. Supp. 3d____, 2021 WL 3667345 (D. Minn. Aug. 18, 2021) Unum argued there, as it does here, that plaintiff

endodontist wasn't disabled because a majority of endodontists do not develop symptoms such as hers. The court rejected that argument, stating:

> The same tasks undertaken by different people may have different results, and the fact that the majority of practicing endodontists have not developed disabling arthritis does not categorically exclude the possibility that Dr. Chapman's work caused her disability. The Court therefore finds Dr. Lahey's conclusions unsupported by the record and not credible. (Id. at *9)

The most glaring deficiency in Defendant's reviews, however, was that none of its reviewers mentioned the most relevant and objective evidence of all—the 4-day vocational rehabilitation evaluation done by Courage Kenny, which conclusively proved that Proctor not only cannot perform the duties of her own occupation but she cannot perform the duties of any occupation—her demonstrated functional capacity was less than sedentary. (AR 1844) As stated in Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1051 (8th Cir. 2011):

> An FCE provides 'objective clinical evidence' regarding how a benefits claimant's medical condition affects his or her ability to work. *Gannon v. Metro. Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir. 2004).

The court in Payzant v. Unum Life Ins. Co. of America, 402 F. Supp. 2d 1053, 1064 (D. Minn. 2005) noted its approval of FCE's as objective evidence of disability:

> Unum failed to set up an FCE for Payzant, which arguably would have provided the most objective evidence possible of Payzant's disability….(emphasis added)

Defendant never personally interviewed Proctor—it relied on a few phone calls, all of which confirmed Proctor's restrictions and limitations. Defendant never had an independent reviewer do a paper review—it relied on its own in-house medical employees. Defendant never had Proctor examined nor conducted its own functional capacity evaluation.

An insurer cannot accept the opinions of its paper reviewers "without considering whether its conclusions follow logically from the evidence," <u>Willox v. Liberty Life Assur. Co. of Boston</u>, 552 F.3d 693, 700-701 (8th Cir. 2009).  An insurer cannot "arbitrarily refuse to credit a claimant's reliable evidence including the opinions of a treating physician," <u>Jaloweic v. Aetna Life Ins. Co.</u>, 155 F. Supp. 3d 915, 944 (D. Minn. 2015), nor can it accept the opinions of its reviewers when it conflicts with the treating physicians' opinions where the decision "lacks support in the record" or is "overwhelmed by contrary evidence."  (<u>Id.</u> at 944-945)

As stated by Judge Frank in <u>Christoff v. Unum Life Ins. Co. of America</u>, 2019 WL 4757884, *9 (D. Minn. Sept. 30, 2019):

> It is an abuse of discretion for an insurer to rely on an independent reviewer's report that reflects an 'incomplete, selective review of the medical evidence. *Id.* at 702." (citing <u>Abram v. Cargill, Inc.</u>, 395 F.3d 882 (8th Cir. 2005)…It is an abuse of discretion to ignore relevant evidence. *Gerhardt v. Liberty Life Assur. Co. of Bos.,* 736 F.3d 777, 780 (8th Cir. 2013)

The court held that it was an abuse of discretion for Unum to terminate benefits by "selective presentation of evidence to its reviewers and disregard for the adamant opinions of Christoff's doctors."  <u>Christoff</u> at *9.

In this case Defendant never explained why it rejected the opinions of all of Proctor's treating physicians that she remained disabled.  Defendant violated its own claims manual by arbitrarily rejecting these opinions:

> Significant weight will be given to the opinion of an AP/HP who is properly licensed and the claimed medical condition falls within the AP's customary area of practice, unless the AP's opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record.  In order for an AP's opinion to be

rejected, the claim file must include specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards and is inconsistent with other substantial evidence in the record. (Exhibit B)

Defendant also never explained how Proctor could perform the duties of her occupation given the documented symptoms she was experiencing and the restrictions and limitations given her by her treating physicians. Defendant's claims manual provides:

A claimant's ability to perform their own or any occupation should be analyzed in terms of the claimant's specific medical R&Ls as well as their specific material and substantial occupational duties. (Exhibit C)

Defendant's vocational analysis showed that Proctor's occupation required extensive computer use ("frequent fingering, constant keyboard use, near acuity, far acuity, depth perception and accommodation") (AR 709) and cognitive skills ("influencing people in their opinions, attitudes, and judgments; making judgments and decisions; dealing with people") (Id.) Defendant never explained how Proctor could perform those duties where it was established by Courage Kenny that she was limited to 2 hours of work activity; her ability to concentrate was limited to 2 hours; her ability to work on the computer was limited to 20 minutes at a time, and she needed breaks every 10-15 minutes. (AR 1844).

Although Defendant gave lip service to allegedly considering Proctor's collective conditions, it never did so. Defendant's claims manual provides:

Where co-morbid conditions are present, all BC professionals evaluating the claim share responsibility to ensure that all conditions are considered and afforded appropriate weight. It is the responsibility of the medical resources when evaluating the claim file to:

• Ensure each condition has been identified, considered, and evaluated with regard to the claimant's functional capacity; and

51

- Assess the combined effect of the conditions and impairments to the whole person.  (Exhibit D) (emphasis added)

Defendant's paper reviews listed each condition, finding that each was not sufficiently impairing; however, none of the paper reviewers considered whether her impairing conditions, taken together, limited her ability to perform the duties of her occupation.

Defendant's review on appeal was no more than a rubber stamp of the initial decision to terminate benefits.  It failed to identify any medical evidence that Proctor's conditions had improved to the point where she could work at her own occupation on a full-time, sustained basis.  It also did not identify any activities that were any different than the activities Proctor had engaged in when Defendant found she was disabled.

### C) The Proper Remedy is Retroactive Reinstatement of Benefits.

Where an ERISA disability case involves the termination of benefits already approved, as opposed to an initial denial, the appropriate remedy is retroactive reinstatement of benefits.  In Welsh v. Burlington Northern, Inc. Employee Benefits Plan, 54 F.3d 1331 (8th Cir. 1995), the defendant argued that the district court erred in awarding past benefits due and "its declaration that Mr. Welsh is entitled to disability benefits in the future for as long as he is disabled or until he is 65 years old, whichever occurs first".  The court noted that under 29 U.S.C. §1132(a)(1)(B), courts have the power to award benefits and to clarify participant's rights to future benefits. The 8th Circuit affirmed, stating:

> We note, in addition, that nothing prevents the health insurance plan from evaluating whether Mr. Welsh continued to be disabled in the future and continues to provide the documentation of that disability required under the terms of the contract.  *See, e.e. Halpin*, 962 F.2d at 697.  Welsh at 1340.

Judge Frank, in <u>Christoff v. Unum Life Ins. Co. of America</u>, 2019 WL 4757884 (D. Minn. Sept. 30, 2019) ordered retroactive reinstatement of benefits in a benefit termination case and ordered Unum to continue payment of benefits so long as the plaintiff continued to qualify under the plan. <u>Id.</u> at *10.

In <u>Cook v. Liberty Life Assur. Co. of Boston</u>, 320 F.3d 11 (1st Cir. 2003), the defendant terminated benefits after 3 years. The court awarded retroactive reinstatement of benefits, finding the termination was arbitrary and capricious. The defendant argued that there was no evidence in the record of plaintiff's disability status after the termination of benefits so the court should remand the case. The court disagreed, and held that the plaintiff was under no obligation to continue to update the medical records:

> It would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit. <u>Id.</u> at 25.

Retroactive reinstatement of benefits after a termination of benefits is the appropriate remedy—absent the wrongful termination, plaintiff would have continued to receive benefits. <u>Groz-Salomon v. Paul Revere Life Ins. Co.</u>, 237 F.3d 1154, 1163 (9th Cir. 2001): "In other words, a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts."

In <u>Ray v. UNUM Life Ins. Co. of America</u>, 224 Fed. Appx. 772 (10th Cir. 2007), the defendant terminated benefits. After trial and a remand for *de novo* review, the trial court "concluded that Ray was entitled to long-term disability benefits from July 27,1996, until she reached the age of 65 'unless and until some

change occurs in her condition which renders her no longer 'disabled.' " (citing the trial court's order) The court of appeals affirmed the award of future benefits, holding that retroactive reinstatement of benefits is the appropriate remedy where the insured would have continued to receive benefits but for the defendant's wrongful termination. As to defendant's argument that there was no evidence in the record on plaintiff's continuing disability, the court held that it was defendant's burden, under the policy language, to request evidence of continuing disability, and defendant never asked for that. Id. at 781. In this case, the policy provides: "We may request that you send proof of continuing disability indicating that you are under the regular care of a physician. This proof, provided at your expense, must be received within 45 days of a request by us." (AR 134) Unum has never requested such proof since its final decision upholding the termination on appeal.

The Third Circuit follows this rule, that where there is a termination of benefits, retroactive reinstatement of benefits is the proper remedy, Miller v. American Airlines, Inc., 632 F.3d 837, 856-857 (3rd Cir. 2001), as does the Seventh Circuit, Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 697-698 (7th Cir. 1992); Hackett v. Xerox Long-Term Disability Income Plan, 315 F.3d 771, 775-776 (7th Cir. 2003), and the Second Circuit, Zervos v. Verizon New York, Inc., 277 F.3d 635, 648 (2nd Cir. 2002) (holding it was an abuse of discretion for the trial court to remand a denial of benefits).

Unum in this case erroneously terminated own occupation LTD benefits on January 29, 2020. The change in definition (CID) from "own occupation" benefits

to "any occupation" benefits occurred on August 27, 2020—three months before

Unum upheld the termination of benefits on November 17, 2020. If Unum had not

erroneously terminated benefits, in the normal course of this claim, it would have

conducted an "any occupation" review before own occupation benefits had expired.

Indeed, the record shows that Unum did a "pro forma" recognition that CID reviews

should have been done on February 27, 2020 (6 month review), April 27, 2020 (4

month review), and August 27, 2020 (final review). (AR 1703-1705). Proctor

would have continued receiving LTD benefits during this review. Proctor should

not now have to be deprived of her monthly long-term disability benefits again while

Unum determines whether she meets the standard of any occupation disability.

Thus, this Court should remand the case to Unum for a determination while ordering

that Unum continue to pay LTD benefits until it makes a final determination on any

occupation disability.

**D) <u>Proctor is Entitled to Attorney's Fees and Costs and Prejudgment Interest.</u>**

1) <u>Attorney's Fees and Costs</u>

The court has discretion to award a prevailing party attorney's fees and costs under

29 U.S.C. §1132(d)(1). "A district court considering a motion for attorney's fees under

ERISA should therefore apply its discretion consistent with the purposes of ERISA, those

purposes being to protect employee rights and to secure effective access to federal courts."

<u>Welsh v. Burlington Northern Ins. Employee Benefit Plan</u>, 54 F.3d 1331, 1342 (8th Cir.

1995).

The factors a court may consider in awarding attorney's fees is set out in <u>Lawrence v. Westerhaus</u>, 749 F.2d 494, 496 (8th Cir. 1984):

- Degree of culpability or bad faith;
- Ability to pay;
- Potential for deterring others in similar circumstances;
- Whether plaintiff sought to benefit all participants or to resolve a significant legal issue regarding ERISA; and
- The relative merits of the parties' positions.

"The absence of bad faith is not dispositive." <u>Starr v. Metro Systems, Inc.</u>, 461 F.3d 1036, 1041 (8th Cir. 2006). While there is no presumption to award fees, "a prevailing plaintiff rarely fails to receive fees." (<u>Id.</u>)

In this case, Defendant's conduct was culpable. Rather than investigate to determine whether Proctor's medical conditions had improved or her activities had increased, Defendant looked to whether her functional capacity had decreased, in other words whether she had gotten worse since Defendant approved benefits. Defendant merely had its own in-house medical personnel review the records; it never interviewed Proctor or had independent paper reviews or an IME or FCE. Defendant misstated the record, and ignored objective evidence that conclusively established Proctor's inability to perform her own occupation due to the restrictions and limitations caused by the MVA. Defendant has the ability to pay an award of attorney's fees. An award of attorney's fees would hopefully deter other insurers from terminating a claimant's benefits where there has been no change in their medical conditions or activities.

56

2)  Prejudgment Interest

An award of prejudgment interest, and the rate of such an award, is discretionary with the Court.  Parke v. First Reliance Standard Life Ins. Co., 368 F.3d 999 (8th Cir. 2004).  Prejudgment interest is an equitable remedy, and in the context of ERISA, should be a measure of the profits made by an insurer that breaches its fiduciary duties to prevent unjust enrichment.  Id. at 1009.  Courts have noted that a wrongdoer should not be allowed to use the funds retained or to keep the interest earned on such funds.  Christianson v. Poly-America, Inc. Medical Ben. Plan, 412 F.3d 935 (8th Cir. 2005).

While the 8th Circuit has approved the use of the federal funds rate, 28 U.S.C. §1961(a) in the past, court have also recognized that in certain instances, an award of prejudgment interest under §1961(a) may not adequately reflect ERISA's remedial purposes to make plan participants "whole".  Gross v. Sun Life Assurance Co. of Canada, 880 F.3d 1 (1st Cir. 2018).  Proctor submits that a more equitable prejudgment interest rate would be Minnesota's state court judgment rate under Minn. Stat. §549.09, Subd. 1(c)(2).

## V)  **CONCLUSION**

Plaintiff respectfully requests that the Court award retroactive reinstatement of Proctor's LTD benefits January 29, 2020, the date of the termination of benefits; remand the case to Unum to determine whether Proctor meets the definition of any occupation disability; and Order that Unum continue payment of LTD benefits until the conclusion of its any occupation review.

Dated:  January 3, 2021                    **NOLAN, THOMPSON, LEIGHTON**
                                           **& TATARYN, PLC**


                                           By: s/Robert J. Leighton
                                                Robert J. Leighton, Jr. (#220735)
                                                Denise Y. Tataryn (#179127)
                                                Attorneys for Plaintiffs
                                                1011 1st Street South, Suite 410
                                                Hopkins, MN 55343
                                                Phone: 952-405-7171
                                                Email:  rleighton@nmtlaw.com
                                                Email:  dtataryn@nmtlaw.com