## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

TRACY PROCTOR,

                                        Civil No. 20-2472 (JRT/DTS)

                         Plaintiff,

v.

                                        **FINDINGS OF FACT, CONCLUSIONS OF**
                                        **LAW, AND ORDER FOR JUDGMENT**
UNUM LIFE INSURANCE COMPANY OF
AMERICA,

                         Defendant.

---

Denise Y. Tataryn and Robert J. Leighton, Jr., **NOLAN THOMPSON LEIGHTON & TATARYN PLC**, 1011 First Street South, Suite 410, Hopkins, MN 55343; and Jodell M. Galman, **GALMAN LAW OFFICES**, 85 Grove Street, Mahtomedi, MN 55115, for plaintiff.

Lauren Hoglund, **LIND JENSEN SULLIVAN & PETERSON, P.A.**, 1300 AT&T Tower, 901 Marquette Avenue South, Minneapolis, MN 55402; and Terrance J. Wagener, **MESSERLI & KRAMER P.A.**, 100 South Fifth Street, Suite 1400, Minneapolis, MN 55402, for defendant.

Plaintiff Tracy Proctor brings this action against Defendant Unum Life Insurance Company of America ("Unum"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., alleging that Unum improperly terminated her long-term disability benefits after she was injured in a car accident. Through her employer, Proctor was covered by a disability policy governed by ERISA and administered by Unum. The parties filed cross Motions for Judgment on the Administrative Record.

Proctor seeks an order reinstating her benefits, and Unum seeks an order affirming its decision.

After carefully considering the entire record and arguments presented in written submissions and at a hearing on the Motions, taking into account the credibility of the evidence, and examining applicable law, the Court will find that Unum improperly terminated Proctor's benefits. Accordingly, the Court will order Unum to reinstate Proctor's benefits retroactively to the date of termination, resume paying Proctor ongoing benefits, and award Proctor reasonable attorney fees and costs and prejudgment interest. The Court, however, does not resolve whether Proctor is disabled under an "any gainful occupation" standard and so remands to Unum to resolve this question. Before ordering a specific amount of fees or prejudgment interest, the Court, however, will require Proctor to file an affidavit providing evidence supporting her request for fees and costs and will order additional briefing from the parties on the proper amount of prejudgment interest.

**FINDINGS OF FACT[1]**

1.     The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

---

[1] The parties submitted the administrative record Unum developed to evaluate Proctor's claim for benefits. (Decl. of Craig J. Johnson, Dec. 31, 2021, Docket No. 17; Sealed Exs. A–D ("AR"), Dec. 31, 2021, Docket No. 18.) Each page is stamped in the bottom right corner with UA-CL-LTD-XXXXXX with XXXXXX representing the page number. For clarity, the Court cites to "AR" then the page number when citing the administrative record. For example, UA-CL-LTD-000104 is (AR 104.)

2.     To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.     THE PARTIES

3.     Proctor, a resident of Minnesota, was employed as a Telephone Supervisor by LTCG.  (Compl. ¶¶ 2, 4, Dec. 4, 2020, Docket No. 1; AR 1897.)

4.     Unum is an insurance company that is licensed to do business in Minnesota. (Compl. ¶ 3; Answer ¶ 3, Dec. 22, 2020, Docket No. 4.)

5.     LTCG provided group short- and long-term disability insurance plans governed by ERISA to its employees—including Proctor—through Unum.  (AR 130.)

## II.     UNUM'S LONG-TERM DISABILITY POLICY

6.     The relevant long-term disability policy ("Policy") defines various terms and explains how to determine whether someone is disabled under the plan.

7.     The Policy defines "disability" as:

You are disabled when Unum determines that:

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

---

Although the Court reviewed the entire administrative record, these Findings of Fact do not exhaustively repeat every fact in the record, instead focusing on the portions of the record that it found most important for the analysis of Proctor's claim.  The omission here of a fact in the record does not mean the fact was not considered.

> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.
>
> You must be under the regular care of a physician in order to be considered disabled.

(AR 146 (emphasis in original and some emphasis removed).)

8.     The Policy defines "material and substantial duties" as:

> duties that:
>
> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified.

(AR 161.)

9.     The Policy defines "regular occupation" as:

> the occupation you are routinely perform when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(AR 163.)

10.     Unum may request that claimants "send proof of continuing disability indicating that you are under the care of a physician.  This proof, provided at your expense, must be received within 45 days of a request by us." (AR 134.)  Unum may also, in some cases, require claimants "to give Unum authorization to obtain additional medical information, or proof of continuing disability." (AR 134.)

11.     The Policy permits Unum to require a claimant to be evaluated by a medical practitioner or vocational expert of its choosing as often as it is reasonable to do so.  (AR 146.)

12.     Once Unum determines that someone is disabled, the claimant continues to receive benefits until, among other reasons, "the date [the claimant is] no longer disabled under the terms of the plan" or "the date [the claimant] fail[s] to submit proof of continuing disability."  (AR 152.)

### III.     PROCTOR'S OCCUPATION

13.     At the time of the accident giving rise to Proctor's claim for disability, her regular occupation was as a telephone supervisor for LTCG.

14.     The job classification that best represents this position is "Call Center Supervisor."  (AR 708.)

15.     The physical and cognitive demands of the material and substantial duties of this job are:

> Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling up to 10 Lbs occasionally.
> The duties of this occupation would allow for changes in position for brief periods of time throughout the day.
> Occasional reaching and handling.
> Frequent fingering.
> Constant keyboard use.
> Near acuity, far acuity, depth perception and accommodation.

(AR 709.)

16.     The skilled work demands of the material and substantial duties are:

Influencing people in their opinions, attitudes, and judgments.
Making judgments and decisions.
Dealing with people.

(AR 709.)

## IV.   INJURY AND EVALUATIONS BEFORE APPROVAL OF LONG-TERM DISABILITY BENEFITS

17.   On February 26, 2018, Proctor was driving when her vehicle was rear-ended by another vehicle driving about 50 miles per hour.  (AR 279–82, 392.)  Her airbag did not deploy.  (AR 281.)  Her head hit the driver's side window.  (AR 355.)  Her head also whipped backwards on impact.  (AR 355.)  She did not lose consciousness.  (AR 392.)

18.   The police officer who responded to the accident reported that Proctor had "[n]o apparent injury," and Proctor declined immediate medical attention.  (AR 281–82.)

19.   Later, on February 26, 2018, Proctor went to urgent care, reporting that she had a headache and had been dizzy since the car accident.  (AR 355.)  While there, she reported having a hard time concentrating including difficulty filling out paperwork and that her vision was blurry.  (AR 355.)  She was diagnosed with a "concussion without loss of consciousness" and a "trapezius strain."  (AR 355.)  The examining doctor told her to not work that day, to rest, and to avoid computer and phone screens but that she soon should be able to return to work.  (AR 356.)

20.   Over the next several weeks, Proctor continued seeing additional medical providers and reporting similar issues.  (*E.g.*, AR 79, 83, 353, 392.)  Below is a non-exhaustive review of these visits and evaluations.

21.     On March 1, 2018, she reported headaches, dizziness, difficulty focusing, and pain from bright lights.  (AR 353.)  The evaluating doctor concluded that she "should improve in a few days."  (AR 354.)

22.     On March 7, 2018, she reported similar symptoms and an evaluation of her mental status showed several difficulties leading the doctor to conclude Proctor "does have clearly ongoing problems with concentration, as well as headaches."  (AR 392–93.) A CT scan, however, was negative.  (AR 393.)

23.     On March 8, 2018, she reported similar symptoms as well as nausea and vomiting to Dr. Nam Ho.  (AR 79.)  Dr. Ho determined Proctor should not work for three weeks to give her brain rest and provided her with a letter to that effect.  (AR 81.)

24.     On March 29, 2018, Dr. Ho again indicated that Proctor was "[u]nable to work at this time," referred her to a concussion clinic, and diagnosed Proctor with post-concussion syndrome.  (AR 84–85.)

25.     On April 4, 2018, she was seen by a developmental optometry specialist who diagnosed Proctor with "deficits of pursuits, binocular instability with convergence insufficiency, and photosensitivity."  (AR 649.)

26.     On April 17, 2018, Proctor saw PA Brooke Dokken at a neurology clinic.  (AR 661.)  Proctor reported that she had daily headaches; right eye pain; nausea with worsening headache; headaches upon waking that can increase with activity and physical, mental, or emotional exertion; dizziness; difficulty balancing; fatigue; various vision

problems; and that medication only reduced but did not resolve her headaches.  (AR 661.)
Proctor reported "difficulty with short-term memory, concentration, multitasking, slowed
processing speed, and word-finding difficulties."  (AR 662.)  She reported that she
continued to drive but that she avoided it when fatigued or during bad weather.  (AR 662.)
Proctor was "not released to return to work."  (AR 663.)

27.    On April 27, 2018, Proctor completed a post-concussion symptom
questionnaire, reporting severe problems with most symptoms on the questionnaire and
moderate problems with several others while reporting the symptoms were constant
throughout the day.  (AR 680.)

28.    On May 25, 2018, Proctor attended speech therapy where she reported
only minimal symptom improvement.  (AR 657–59.)  She reported ongoing constant
headaches but with a slight improvement in the severity from severe to moderate
although still becoming severe at times.  (AR 657.)  Proctor reported that she had severe
blurry vision such that it required significant effort to read and could only read one
paragraph at a time and that she could not watch television screens, instead only
listening.  (AR 657.)  Her therapist recommended against returning to work and against
work hardening.  (AR 658.)

29.    On May 31, 2018, Proctor saw PA Dokken again and continued to report
similar symptoms as she did at her April 17 appointment.  (AR 650.)  The visit notes show
that Proctor had declined to take a medication out of a fear overdoses or withdrawal, but

that she agreed at this visit to try a lower dose to reduce headache pain.  (AR 649–50, 652.)  PA Dokken again found that Proctor should not work with follow up again in one month.  (AR 652, 654.)

30.    During occupational therapy on June 1, 2018, Proctor reported that she could only read two lines at a time and that using a computer was worse than reading including noting that it recently took her more than two hours to send an email.  (AR 687.)  She was found to have various impairments including pain, functional mobility, endurance and activity intolerance, attention impairments, memory impairments, and processing speed impairments, and various issues with visual perception and processing.  (AR 691.)

31.    On August 8, 2018, she was seen by a developmental optometry specialist who diagnosed Proctor with "improved deficits of pursuits, improved binocular instability, and continued photosensitivity" but that treatment was still necessary.  (AR 866.)

32.    On September 4, 2018, Proctor saw PA Dokken again and continued reporting similar symptoms with no change in their intensity.  (AR 867.)  She had discontinued speech therapy to focus on pain and mood management.  (AR 867.)  She had also been attempting to complete one to two hours per day of continuing education as work hardening but struggled with tolerating the computer screen.  (AR 868.)

33.    On September 10, 2018, Proctor attended occupational therapy again for recertification.  (AR 826.)  She attended nine appointments from June 1 to August 21,

2018. (AR 826.) She again completed a post-concussion questionnaire, reporting similar results although noting her headache at the appointment was not as bad. (AR 826–27.) The therapist noted similar impairments to her previous visits and noted that the impairments would cause limitations in her reading and computer use. (AR 830.)

34.     On September 11, 2018, Proctor underwent vestibular testing. (AR 835–49.) Proctor reported similar symptoms at the testing. (AR 850.) The testing revealed normal results in many areas but also abnormal sensory organization, abnormal ocular pursuits, multisensory deficit pattern, and beating nystagmus. (AR 850–51.)

35.     On September 12, 2018, Proctor reported in a neurology clinic appointment that her symptoms did not appear to be improving and that her vision and balance symptoms were worsening with time. (AR 556.) The provider noted that "postconcussive symptoms can be slow to improve" but that they can over time with proper treatment. (AR 556.)

36.     On October 9, 2018, at an occupational therapy appointment, Proctor demonstrated various visual deficits. (AR 523.) Proctor also reported increased symptoms with visual tasks. (AR 523.) Certain accommodations improved her ability to complete various exercises and she had increased tolerance of certain activities but demonstrated very limited peripheral processing. (AR 523.)

37.     On November 8, 2018, Proctor again saw PA Dokken and again reported no improvements in her symptoms. (AR 793.) She also reported that her medications were

not improving the frequency or intensity of her headaches.  (AR 793.)  She reported to PA Dokken that she was volunteering for her daughter's basketball team but a task of reviewing spreadsheets and calendars that used to take ten minutes now required two hours.  (AR 796.)  She expressed an interest in working but was concerned with her ability to do so.  (AR 796.)  PA Dokken concluded that Proctor is still symptomatic but that symptoms appear to have stabilized.  (AR 797.)  PA Dokken released her to work up to two hours per day, three days a week and to volunteer as work hardening.  (AR 797–98.)  PA Dokken indicated any work should be scheduled on non-consecutive workdays and Proctor should take a ten-minute break every hour or as needed but that the recommendations may need to be changed based on Proctor's tolerance.  (AR 1200.)  PA Dokken certified that Proctor had been disabled from the tasks required of her work from February 26 through November 8, 2018, and that she would be reevaluated in January 2019.  (AR 505.)  PA Dokken, however, indicated that she expected Proctor to recover at some point in the future.  (AR 505.)

## V.   APPLICATION, APPROVAL, AND TERMINATION OF BENEFITS

38.   On or about March 5, 2018, Proctor applied for short-term disability benefits through Unum and Unum began requesting information from her providers.  (*See* AR 111, 113.)  Dr. Ho informed Unum that Proctor had been advised to stop working beginning on the day of the accident through at least March 29, 2018.  (AR 114–15.)  PA Dokken certified to Unum that Proctor was not released to work as of April 17, 2018, and

her ability to return to work would be reevaluated approximately one month later.  (AR 69–71.)

39.     Proctor also applied for long-term disability benefits from Unum in early March 2018.[2]

40.     On August 28, 2018, LTCG informed Proctor that it was terminating her "because you are not able to return to work yet from your leave of absence and you have exhausted your FMLA and extended leave time."  (AR 1897.)

41.     Unum underwent a process of evaluating Proctor's long-term disability claim.

42.     On September 19, 2018, Unum completed a phone conversation with Proctor who reported to Unum similar symptoms that she reported around this time to various medical providers and informed Unum that she was undergoing vestibular, neurological, and speech therapy.  (AR 283–89.)

43.     In November 2018, RN Kelly Ghidoni evaluated Proctor's records and application on behalf of Unum.  (AR 717–21.)  RN Ghidoni concluded that from February 26, 2018, through the date of her evaluation (1) the evidence did not support a disability based on neck and thoracic pain, (2) the evidence did support a disability finding for her

_____

[2] The administrative record does not clearly identify when Proctor applied for long-term disability benefits, instead only indicating that she applied for short-term benefits.  (*See, e.g.*, AR 69, 111.)  The parties, however, do not dispute that Proctor also applied for long-term benefits sometime in early March.  (*See* Def.'s Proposed Order ¶ 6, Dec. 31, 2021, Docket No. 20; Pl.'s Proposed Order ¶ 11, Jan. 3, 2022, Docket No. 25.)

regular occupation on the basis of visual and vestibular deficits, and (3) although Proctor had moderate cognitive and linguistic deficits, more evidence was necessary to evaluate her cognitive functioning.  (AR 720.)  RN Ghidoni opined that she would expect Proctor would continue to improve and return to prior functioning with two to three months.  (AR 720.)

44.     On November 28, 2018, Unum approved Proctor's application for long-term disability benefits.  (AR 724.)  Unum determined that her disability began on February 26, 2018—the date of the accident—and long-term disability benefits would begin effective August 27, 2018.  (AR 724.)  More specifically, it determined she was disabled because of her "symptoms of visual/vestibular deficits," but that the available information "does not support impairment due to . . . diminished cognition or mental health symptoms."  (AR 724.)  Unum noted it would, however, continue to review any treatment, restrictions, and limitations she received regarding any diminished cognition or mental health symptoms. (AR 724.)  Unum planned to reevaluate her in January 2019.  (AR 725.)

45.     Throughout 2019 and into January 2020, Unum periodically evaluated whether Proctor remained disabled as described in detail below.

46.     On January 29, 2020, Unum terminated Proctor's long-term disability benefits.  (AR 1689.)  Unum determined that, as of that date, Proctor was able to perform the duties of her previous occupation at LTCG on a full-time basis and so was therefore no longer disabled under the policy.  (AR 1690.)

-13-

47.     In its termination notice, Unum described the results from numerous

medical evaluations.  (AR 1690–93.)  Unum then explained its reasoning for terminating

benefits:

> Based on our review, the information in the files does not support the opinions of your providers or correlate with the inability to perform the demands of your regular occupation referenced above.
>
> The mechanism of injury does not correspond with a prolonged period of impairment.  Your activities as documented above are more than the demands required by your occupation.  Your reported ability to drive indicates you have the ability to plan, complete visuospatial skills, and demonstrates attention and concentration.
>
> You attended vestibular therapy.  However, there is an absence of recently documented nystagmus or other findings that correspond with impairment due to dizziness.
>
> Although the neuropsychological assessment in January, 2019 showed neurocognitive dysfunction, you have undergone treatment with discharge from therapy.  Recommended repeat neuropsychological testing has not been performed.
>
> While you have reported having daily headaches, there are no physical findings on examination or functional testing to support that the headaches are not relieved with medication or that the headaches precluded you from performing sedentary work as outline above.
>
> There is an absence of specific physical findings that correspond with any level of impairment.  There is a lack of neurologic deficits, musculoskeletal findings, or imaging that correlates with the inability to perform the outlined occupational demands.

> There is a lack of information in the medical records that the reported prescription medications have produced impairing effects. Your other conditions are not associated with restrictions or limitations or rise to a level of impairment.

(AR 1693–94.)

48.     On September 23, 2020, Proctor administratively appealed the termination through Unum's appeals process. (AR 1771–92.)

49.     On November 17, 2020, Unum denied Proctor's appeal, upheld her termination of benefits, and notified her of her right to challenge the denial in court. (AR 1995–2003.) As a part of the appeals process, Unum considered new evidence submitted by Proctor in support of the appeal. (AR 1997, 2000.)

## VI.   MEDICAL TREATMENT AND EVALUATIONS BETWEEN APPROVAL, TERMINATION, AND DENIAL OF APPEAL

50.     In the nearly two-year period between Unum's approval of Proctor's disability and its denial of her termination appeal, Proctor continued to see numerous providers for evaluation, testing, treatment, and therapy.

51.     On January 14, 2019, at an occupational therapy recertification, Proctor reported that overall her symptoms had been getting better with some improving—such as less nausea—and others remaining similar—such as dizziness and headaches. (AR 776–77.) She reported some visual symptoms, however, were worsening. (AR 776–77.) Proctor reported only being able to read or use a computer for approximately ten minutes at a time and that, even when using larger font sizes, she still struggled to read. (AR 780.)

Her therapist concluded that she still had similar impairments from her previous evaluation that resulted in limitations including on computer use and reading.  (AR 782.)

52.   On January 14, 2019, at a physical therapy appointment, Proctor reported similar symptoms with some progress but continued problems in many areas.  (AR 786.)

53.   On January 17, 2019, Proctor completed a neuropsychological evaluation with Dr. David Tupper.  (AR 923–31.)   At this evaluation, she reported continued headaches, reduced balance, and dizziness at times.  (AR 925.)  She also reported vision difficulties, problems reading, difficulty with expressing herself, and memory problems. (AR 925–26.)  Dr. Tupper found that "[s]he was fully cooperative and showed generally adequate effort for the evaluation, and she was noted to perform within normal limits on both embedded and stand-alone performance validity measures."   (AR 926.)   The evaluation showed numerous cognitive problems: "Visual attention is significantly variable and falls in the below average range . . . . Sustained visual attention is impaired . . . . Processing speed in complex tasks falls well below average on several measures." (AR 927.)  She showed severe organizational impairments.  (AR 927–28.)  She, however, also showed various areas with normal results including in intellectual capabilities, language skills including fluency and vocabulary, learning and memory skills, and judgment.  (AR 927–28.)  She demonstrated "moderate to severe impairment in learning and free recall of visual/nonverbal memory material" with spatial errors in visual recall.  (AR 928.)  Dr. Tupper concluded that Proctor "especially struggles in processing,

organizing and accurately recalling visual information," that these demonstrated "objective neurocognitive dysfunction," and that she met "the criteria for formal diagnosis of moderate cognitive impairment." (AR 929.) As a result, Dr. Tupper found that her "current cognitive impairments are significant enough to limit her daily function to a moderate degree at this time, although they are not progressive." (AR 929.) Based on this, he found that she would "struggle in competitive employment settings," "appears at least partially disabled at this time from a cognitive perspective," and is more likely fully disabled at that time because of this and her other symptoms. (AR 930.)

54.    On March 14, 2019, although Proctor continued to report visual symptoms that were worsening since May 2018, Dr. Amy Chang—an optometrist—noted that "her visual deficits have actually improved significantly. Deficits of pursuits have mostly resolved, binocular instability has resolved, and convergence has improved." (AR 1114.) Objective testing demonstrated "near normal ranges or improvements overall" for her visual issues. (AR 1126.)

55.    On the same day, March 14, 2019, at a physical therapy appointment, Proctor showed some improvement in various tests but also tested 34 percent below normal on a sensory organization test. (AR 1129.) Her provider concluded that she had minimal change from her previous visit. (AR 1130.) Because Proctor showed an ability to continue the exercises independently and her symptoms had plateaued, Proctor's therapist decided to terminate therapy. (AR 1126.)

56.     In April 2019, Proctor completed a vocational rehabilitation evaluation at the Courage Kenny Rehabilitation Institute ("Courage Kenny").  (AR 1007–10.)  She reported similar symptoms to Courage Kenny as she had to other providers, including sensitivity to light, dizziness and nausea, difficulty looking at screens or anything requiring her vision, and visual distortions especially with reading.  (*See* AR 1007–10.)  She reported a headache from looking at a screen within thirty minutes.  (AR 1010.)  When completing tasks on a computer, at first she could work for approximately twenty minutes, followed by ten-minute breaks.  (AR 1009.)  Over time, the amount of time she could work decreased while the length of breaks increased.  (AR 1009.)  The evaluator found that Proctor was limited to working about two hours, was limited to using a computer screen for twenty minutes before needing a ten-to-fifteen-minute breaks in a dark room, and could only complete simple structured tasks of three steps.  (AR 1843.)  Proctor had chronic headaches, dizziness, nausea, and visual distortions.  (AR 1844.)  As a result, the evaluator concluded that her work options were very limited and in a paid position would require a "very simple, low volume, low stress setting" where she could complete one task at a time with breaks.  (AR 1844.)

57.     In June 2019, Proctor reported that she was volunteering in a low-stress fundraising role for the Children's Cancer Network at her own pace.  (AR 1293.)

58.     On June 4, 2019, a doctor released her to work two hours a shift, three days a week.  (AR 1348.)

59.     On August 19, 2019, Proctor saw neurologist Dr. Andrew Smith.  (AR 1430–37.)  She reported similar headaches, dizziness, vision, and memory problems.  (AR 1431.)  Dr. Smith reviewed the brain imaging and concluded any abnormalities on it were unlikely to have been caused by the accident.  (AR 1437.)  He concluded, however, that she had significant abnormalities connected with her traumatic brain injury and that her visual issues were consistent with the neuropsychological examination performed by Dr. Tupper.  (AR 1437.)  Dr. Smith found the headaches "very debilitating" and recommended prioritizing treating them.  (AR 1437.)

60.     Beginning in October 2019, Proctor attended vision and vestibular therapy as often as twice per week.  (AR 1626, 1630.)

61.     On October 14, 2019, Dr. Smith reported to Unum that she was unable to perform her work duties and that he was uncertain when she would sufficiently recover to resume her duties.  (AR 1429.)

62.     At the advice of Dr. Chang, Proctor received a second opinion on her visual defects from a second optometrist—Dr. Donald Sealock.  In December 2019, in response to an Unum review of benefits, Dr. Sealock found that Proctor still had convergence insufficiency, she had 20/100 near vision in both her right and left eyes with correction, and that she still had binocular vision disorder.  (AR 1578, 1655.)  He noted that this would severely affect Proctor's reading, computer and monitor use, visual discrimination, and depth perception.  (AR 1579.)  He indicated there had been some improvement since she

was first injured and that once she completed a treatment plan of 24 to 32 office visits and home therapy there was a high likelihood of success.  (AR 1655.)

63.    In January 2020, Dr. Sealock found again that Proctor still had convergence insufficiency.  (AR 1659.)

64.    On a January 14, 2020, call with Unum, Proctor reported that she had the same symptoms and that Dr. Sealock told her she could expect her vision problems to get worse before they got better but she would require six to eight months of treatment while noting that everyone is different.  (AR 1630.)  She reported continued cognitive issues. (AR 1630.)

65.    On January 22, 2020, Dr. Craig Hyser responded to Unum that Proctor was unable to complete the occupational demands of her job on a full-time basis due to ongoing daily headaches and cognitive impairments.  (AR 1669.)

66.    On June 24, 2020, Dr. Hyser again reported that she remained disabled and had ongoing symptoms from the car accident.  (AR 1832.)

67.    On August 6, 2020, after Unum terminated Proctor's benefits but before she appealed, Dr. Tupper completed a second neuropsychological reevaluation.  (AR 1826–30.)  Dr. Tupper again noted that she gave adequate effort although she was "rather slow in task execution," concluding that the evaluation appeared "generally reliable and valid given adequate cooperation and effort, and normal performance validity findings."  (AR 1827–28.)  Dr. Tupper again concluded that she "presently shows moderate cognitive

dysfunction" with some possible declines which "is not common or expected following a [traumatic brain injury]." (AR 1829.) He also found that "she clearly is showing greater functional disturbance for everyday functioning at this time in her recovery." (AR 1829.) Dr. Tupper's results showed that Proctor's intellectual, learning, and memory capabilities generally lowered in performance but that her verbal results continued to outperform her visual and nonverbal results. (AR 1829.) Dr. Tupper concluded the declines could be caused by a more severe psychiatric disability. (AR 1829.) He concluded that "[b]ased on the present findings, I do not think that she presently is capable of return to work." (AR 1830.)

## VII.   UNUM'S EVALUATIONS AND APPEAL DENIAL EXPLANATIONS

68.   After initially approving her long-term disability application, Unum periodically reviewed Proctor's file, spoke with Proctor, and gathered reports from her providers to consider whether she remained disabled.

69.   In a March 2019 review, Unum found that Proctor remained "impaired [due to] ongoing vestibular [symptoms]." (AR 960.)

70.   On May 15, 2019, Proctor reported to Unum that she continued to suffer from similar symptoms as those reported elsewhere. (AR 971.) She reported that her balance was improving but that vision therapy ceased because she had made no progress. (AR 971.)

71.   In a July 2019 review, Unum's reviewer Lynn Gorham found that it was "unclear" whether Proctor was still disabled. (AR 1339.) Gorham found that "the record

does not document any sustained improvement," but that "it is not clinically reasonable to expect that" based on the original injury and the amount of time.  (AR 1339.)  Gorham recommended obtaining additional medical records.  (AR 1339.)

72.     On July 30, 2019, a family medicine physician evaluator for Unum, Dr. Peter Kouros, concluded that Proctor was not precluded from performing her occupation on a full-time basis, concluding there was a lack of information supporting impairment, the information did not correlate with an inability to perform, and the cause of her injury did not correspond to the duration of her impairment, and her daily activities were in excess of the occupation demands.  (AR 1348–49.)  He found that an independent medical examination was unnecessary.  (AR 1349.)  He recommended a follow up review of Dr. Tupper's first assessment.  (AR 1349.)

73.     On September 26, 2019, Dr. William Black completed a review of Dr. Tupper's first assessment.  (AR 1386–88.)  Dr. Black found no evidence that the cognitive test results were invalid but did find inconsistencies in performance he suggested were non-neurological.  (AR 1387.)  Reviewing the results, Dr. Black found continued cognitive abnormalities.  (AR 1387–88.)  He found, however, that the results were inconsistent with typical and expected results for similar injuries and imaging showing at most a mild, uncomplicated concussion.  (AR 1387.)  He indicated that remission of symptoms would have been expected within days or weeks.  (AR 1387.)  Dr. Black also concluded the test results were inconsistent with her level of activity.  (AR 1387.)

74.     Over the next several months through January 27, 2020, Dr. Kouros and Unum's Designated Medical Officer, Dr. Suzanne Sergile, reviewed Proctor's file including updated records, and they continued to reach the same conclusion that Proctor was not disabled and her impairments were not supported by the available evidence.  (AR 1401–02, 1558–62, 1591–92, 1597–1602, 1675–76, 1680–81.)  For example, on October 9, 2019, Dr. Sergile noted that "no specific physical findings . . . support that the claimant would be unable to perform [the] full-time work" of her occupation, noting that she has not undergone repeat neuropsychological testing.  (AR 1401–02.)  Dr. Kouros continued to conclude that an independent medical examination was unnecessary.  (*E.g.*, AR 1676.)

75.     Over a similar period, Proctor continued to report similar symptoms as her past reports whenever speaking with Unum.  She reported little improvement from treatment, continued vision problems, headaches, and memory problems.  (AR 1390–91, 1411–12, 1630–31.)  On one such call, the Unum employee noted "that she had difficulty getting thoughts out."  (AR 1391.)

76.     When denying Proctor's appeal of its termination on November 17, 2020, Unum explained why it concluded that Proctor was no longer disabled.  (AR 1997–2001.)  This explanation appears to largely be based on a review of the records performed by Dr. Jacqueline Crawford on October 7, 2020.  (*See* AR 1968–74.)

77.     Unum explained why it concluded her cognitive impairments were insufficient to demonstrate the existence of a disability.  (AR 1998.)  To summarize its

reasons, it found that cognitive impairments did not cause a disability because (1) in most cases cognitive impairment is worst in the hours and days after the injury, (2) most people's cognitive impairments from mild concussions resolve within 3 months, (3) Proctor's symptoms instead expanded and worsened over time and were inconsistent with the normal trajectory, (4) these symptoms were largely self-reported, (5) brain imaging did not reveal damage consistent with her injury in March 2018 and April 2019, (6) objective analysis supporting impairment did not include sufficient validity measures, (7) Proctor did not follow through on recommend care that may have alleviated some symptoms, and (8) her level of activity was inconsistent with the impairments she claimed.  (AR 1998.)

78.     Unum explained why it concluded vestibular impairment and dizziness were insufficient to demonstrate a disability because her symptoms improved including meeting therapy goals and her daily activities were inconsistent with an impairment from dizziness.  (AR 1999.)

79.     Unum explained that it concluded visual deficits were insufficient to be disabling because (1) she showed significant improvements according to Dr. Chang in March 2019, (2) Proctor's reported symptoms were inconsistent with these findings, (3) she drove and participated in activities inconsistent with vision deficits, and (4) Dr. Sealock's findings were inconsistent with Dr. Chang's.  (AR 1999.)

80.     Unum explained that it found her headaches were insufficient to be disabling.  (AR 1999.)  It found that, although she reported headaches after the accident, she did not need continued care after September 2018 and there was no evidence of unscheduled medical visits for severe headaches in 2019 or 2020.  (AR 1999.)

81.     Unum also it explained why it found that other symptoms—neck, back, and upper extremity pain; fatigue; and mental illness—were insufficient to be disabling.  (AR 1999–2000.)   It also claimed to have reviewed all symptoms and conditions both individually and collectively and considered all evidence in the file in making its determination.  (AR 2001.)

## VIII.   OTHER FINDINGS OF FACT

82.     The Social Security Administration denied Proctor's application for disability benefits under an "any kind of substantial work" standard.  (AR 1920–25.)

83.     Proctor's husband and a friend each submitted statements written in April 2020 that generally corroborate Proctor's reported symptoms and the effects of those symptoms.  (AR 1903, 1905.)

84.     The Court did not find evidence that any provider who personally examined Proctor stated they believed Proctor was unreliably reporting her symptoms, her self-reported symptoms lacked credibility, or that Proctor was engaging in symptom magnification.

85.     Based on the evidence in the Administrative Record, through at least August 2020, no medical professional who personally examined Proctor cleared her to work full-

time or to work more than approximately six hours per week with regular breaks.  While the record never clearly establishes a precise quantity, this appear to be consistent with approximately the most amount of time Proctor volunteered in one week.

## IX.    PROCEDURAL HISTORY

86.    After Unum denied Proctor's appeal, Proctor filed this ERISA action on December 4, 2020.  (Compl.)

87.    The parties stipulated to filing cross motions for judgment on the administrative record under Federal Rules of Civil Procedure 39(a)(1) and 52(a)(1).  (Decl. of Robert J. Leighton ("Leighton Decl."), Ex. A ("Stip.") ¶ 2, Jan. 3, 2022, Docket No. 23.)

88.    In their stipulation, the parties agreed each seeks a determination (1) as to whether Unum wrongfully terminated Proctor's long-term disability benefits; (2) whether Proctor has met her burden of proof, by a preponderance of the evidence, that she is entitled to payment of long-term disability benefits past the date benefits were terminated; and (3) the appropriate remedy.  (*Id.* ¶ 3.)

89.    In their stipulation, the parties agreed the standard of review the Court should apply is de novo.  (*Id.* ¶ 4.)

90.    In their stipulation, the parties agreed that the evidence to be relied upon is Unum's administrative record—the parameters of which the Court will decide—without reference to ordinary Rule 56 summary judgment motion standards.  (*Id.* ¶ 5.)

91.     The parties both filed Motions for Judgment on the Administrative Record. (Def.'s Mot. J. on Admin. Record, Dec. 31, 2021, Docket No. 14; Pl.'s Mot. J. on Admin. Record, Jan. 3, 2022, Docket No. 21.)

92.     The Court held a hearing on the Motions on May 24, 2022.

## CONCLUSIONS OF LAW

### I.     STANDARD OF REVIEW

1.     ERISA allows a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

2.     The Court's review of plan determinations is de novo unless the plan grants discretionary authority to the plan administrator.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–15 (1989); *accord Johnson v. U.S. Bancorp Broad-Based Change In Control Severance Pay Program*, 424 F.3d 734, 738 (8th Cir. 2005).  As the parties agree, the plan here does not give Unum discretionary authority, and the Court reviews Unum's determination de novo.  (Stip. ¶ 4.)  Therefore, the Court gives no deference to Unum's decision.  *See Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir. 1992).  This applies to both issues of plan interpretation and fact-based determinations.  *Riedl v. Gen. Am. Life Ins. Co.*, 248 F.3d 753, 756 (8th Cir. 2001).

3.     It is undisputed that Proctor bears the burden of proving by a preponderance of the evidence that she is entitled to payment of long-term disability

benefits past January 29, 2020, within the meaning of the plan.  *See Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992); (*see also* Stip. ¶ 3.)

4.      Because the parties have expressly asked for a ruling under Rules 39(b) and 52(a)(1), the Court acts as a factfinder and may resolve factual disputes, make credibility determinations, and weigh the evidence.  *See Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1026 (8th Cir. 2021); *Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 716 (D. Minn. 2021).

## II.      RECORD EVIDENCE

5.      It is undisputed that the Court may rely on Unum's administrative record that Unum filed with the Court.  The parties' Stipulation states that the "evidence to be relied upon is the Defendant's administrative record (the parameters of which will be determined by the Court) without reference to Fed. R. Civ. Pro. 56 motion standards." (Stip. ¶ 5.)

6.      In support of her Motion, Proctor also filed and referenced excerpts from Unum's Claims Manual and public reference materials.  (*See* Pl.'s Mem. Supp. Mot. J. on Admin. Record at 42, Jan. 3, 2022, Docket No. 24; Leighton Decl., Exs. B–D.)

7.      The administrative record as filed does not contain the Claims Manuals or the public materials Proctor cites.

8.      In its response to Proctor's Motion, Unum "moves the Court to strike or otherwise decline to [consider] the additional documents or evidence outside the Administrative Record."  (Def.'s Resp. Pl.'s Mot. at 14 n.5, Feb. 2, 2022, Docket No. 27.)

-28-

At the hearing on these Motions, however, Unum dropped its objection to considering the Claims Manual but reaffirmed its opposition to considering the other materials—websites Proctor cites—arguing they have no foundational basis and there is no evidence Unum or Proctor's providers relied on them.

9.      In an ERISA case of this nature, "normally the district court must limit its review to the administrative record." *Avenoso*, 19 F.4th at 1025.  There are, however, exceptions to this.  When the appropriate standard of review of the insurer's decision is de novo, "the district court may admit additional evidence for the purpose of deciding the merits 'if there is good cause to do so.'"  *Id.* at 1026 (quoting *King v. Hartford Life & Accident Ins.*, 414 F.3d 994, 998 (8th Cir. 2005) (en banc)).  A court may also do so if there is a dispute about what is included in the administrative record and the court needs evidence to resolve what is in the record.  *Id.*

10.      When deciding whether good cause exists, the Eighth Circuit has typically "focused in large part on whether the claimant had an opportunity to present the additional evidence during the administrative proceedings.  An opportunity and failure to present the additional evidence shows a lack of good cause." *Sloan v. Hartford Life & Acc. Ins. Co.*, 475 F.3d 999, 1004 (8th Cir. 2007).  Good cause has been found when factual evidence was not available at the time the insurer made its decision such as medical evidence or other determinations. *E.g., id.*; *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200–01 (8th Cir. 1998).

11.     Although the Claims Manual does not appear in the record, it appears its purpose is to guide Unum employees when evaluating disability claims and is therefore likely necessarily a part of the claims adjudication process even if Unum employees never explicitly cite it.  It, therefore, is likely a part of the administrative record.  Because the Court finds that the Claims Manual is likely part of the administrative record, the parties' Stipulation indicated the Court could resolve the parameters of the record, and Unum dropped its opposition to considering it, the Court will admit the Claims Manual as record evidence.

12.     The public reference materials Proctor cites, however, are not likely to be a part of the administrative record in the same fashion.  Moreover, Proctor has not explained why she could not have gathered this evidence and presented it to Unum to consider as a part of its evaluation process.  If Proctor thought this evidence was necessary for Unum to make its determination, she could have obtained and submitted it to Unum.  Having failed to do so or explain her failure to do so, there is not good cause to consider these materials.  *See Brown*, 140 F.3d at 1201.  Therefore, the Court will not consider them.[3]

---

[3] The Court, however, concludes that even if it did not consider the Claims Manual and/or did consider the public reference materials, it would come to the same result.

III.    **ANALYSIS**

A.    **Disability Determination**

13.    Unum determined Proctor was no longer disabled as of January 29, 2020. Proctor challenges this determination.  Therefore, the Court's role is solely to determine whether she was still disabled as of that date, not whether she remained disabled beyond that time.

14.    When reviewing an ERISA plan administrator's decision de novo, the Court begins by examining the language of the plan documents.  *Kitterman v. Coventry Health Care of Iowa, Inc.*, 632 F.3d 445, 448 (8th Cir. 2011).  The Court interprets the terms of the plan documents "by giving the language its common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean" and by reading each provision consistently with the plan as an integrated whole.  *Id.* (quoting *Adams v. Cont'l Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004)).

15.    The Policy defines "disability" by focusing entirely on the limitations of the claimant.  It repeatedly uses the words "you" and "your" and does not indicate Unum may consider whether the claimant's injury or progression is typical.  Therefore, the plain terms of the Policy indicate the inquiry is whether the claimant herself is disabled based on her sickness or injury, not whether the ordinary person with a similar sickness or injury would be disabled or how the typical person progresses after the event precipitating the sickness or injury.

16.    The Policy indicates that a claimant is disabled if she is limited from performing her duties due to the sickness or injury, meaning that the disability determination is made by looking at the combination of all limitations caused by the sickness or injury.  Therefore, even if no single impairment or symptom is disabling, the claimant may still be disabled if multiple impairments collectively prevent the performance of work duties.

17.    After carefully reviewing the entire record, the preponderance of the evidence demonstrates that Proctor remained disabled as of January 29, 2020, based on a combination of her symptoms and limitations.

18.    When Unum approved Proctor's application for long-term benefits in November 2018, it based this conclusion on the visual and vestibular deficits found by RN Ghidoni.  There is mixed evidence on whether and the extent to which these deficits improved.  In March 2019, Dr. Chang concluded that most deficits had improved significantly with some issues resolving.  Dr. Chang, while noting that convergence had improved, did not state that it had resolved.  On the same date, however, Proctor scored 34 percent below normal on a sensory organization test.  In December 2019 and January 2020, Dr. Sealock found that Proctor still had convergence insufficiency and binocular vision disorder, while still noting there had been some improvements since her injury. This is consistent with Proctor's own symptom reports of blurry and double vision through the conversation Proctor had with Unum on January 14, 2020.  (*See* AR 1630.)  The last

time, however, that someone specifically opined that she was disabled based exclusively on her visual or vestibular deficits was in March 2019.

19.     When Unum initially granted her long-term disability application in November 2018, it did not specifically resolve whether she was in fact disabled solely because of any cognitive impairments because it needed additional evidence.  As Proctor bears the burden of proving disability, insufficient evidence is sufficient to deny benefits if Unum's analysis was correct.   Proctor's self-reported symptoms suggest that her cognitive problems may have been worsening with time.   Both Unum and Proctor's treating providers remarked that this was atypical.  Crucially, however, nothing in the record shows that any of the providers who actually examined Proctor questioned these symptom reports or found that they lacked credibility.   These providers are better positioned to evaluate whether her subjective symptoms are consistent with their observations than Unum's reviewers who never evaluated her in person.  *See Kaminski v. UNUM Life Ins. Co. of Am.*, 517 F. Supp. 3d 825, 862 (D. Minn. 2021).  Additionally, the evidence shows that she began suffering cognitive symptoms the same day as the injury. (*See* AR 355.)   An examination ten days after the accident also showed cognitive problems.  (*See* AR 392–93.)  Throughout this time her providers recommended that she not work.  (*E.g.*, AR 83–84, 659, 661–63, 667–69.)

20.     Over time, her providers began to recommend she begin doing work related tasks but still did not clear her for work consistent with her occupation on full-time basis.

(*E.g.*, AR 456, 487, 797–98, 866–72.)  By November 8, 2018, she was cleared to work two hours per day, up to three days a week on non-consecutive days, with ten-minute breaks every hour.  (AR 456.)  By at least June 2019, she had begun volunteering with Children's Cancer Network fundraising and with her daughter's basketball team.  (AR 1293.)  Still no provider indicated her cognitive problems had resolved sufficiently to allow a return to her previous occupation or full-time work.  And nothing in the record suggests her volunteer work was similar to or exceeded the requirements of her occupation.

21.     Dr. Tupper's neuropsychological evaluations in both January 2019 and August 2020 showed that Proctor had cognitive dysfunction and that she was not capable of work.  For example, during the January 2019, screening, Dr. Tupper found that Proctor was at least partially disabled from performing her normal occupation based solely on her cognitive difficulties and should be considered fully disabled based on her full symptoms.

22.     The Court also considered Proctor's self-reported symptoms.  Throughout the time period she reported headaches, dizziness, and vision problems such as blurry and double vision.  She also reported light sensitivity and sensitivity to screens.  In affirming its denial, Unum asserted that she did not need continued treatment from a specific provider for her headaches after September 2018 and did not seek unscheduled care for headaches in 2019 or 2020 as grounds for suggesting her headaches were insufficiently severe to warrant a disability.  She, however, continued to receive medication for her headaches through at least January 22, 2020.  (AR 1672.)  And she may

not have sought unscheduled care in 2019 and 2020 because she had been experiencing the symptoms for more than a year and so the symptoms would not have been emergent such that unscheduled care would have been warranted.  *Cf. Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003) (noting in a Social Security disability case that it is possible for a person to improve but remain disabled).

23.     The Court finds that Proctor's self-reported symptoms are credible for several reasons.  First, Proctor consistently reported the same or similar symptoms beginning within days of her injury to the most recent evidence on the record.  She did not add wholly new symptoms or otherwise show inconsistencies.  She has also remained consistent in different situations and with different providers.  Second, Dr. Tupper's evaluations also support the credibility of Proctor's self-reported symptoms as she performed better in the areas where she has not reported subjective symptoms such as auditory processing.  Third, the record has no evidence that any provider who has evaluated Proctor in person has ever questioned her credibility or suggested she is magnifying her symptoms.  This is so even when providers acknowledged her symptoms were not as expected or inconsistent with other objective improvements.  (*See, e.g.*, AR 1114.)  Fourth, the testimony of her husband and a friend corroborates her symptom reports.[4]

---

[4] The Court recognizes, however, that Proctor and her husband especially, but also her friend, have some biases that may lead them to not entirely accurately state her condition even if unconscious.

-35-

24.     Unum responds to this evidence on the record—in its termination, denial, and before the Court—by arguing that most people's impairments from a mild concussion resolve within months, Proctor's symptoms worsened overtime, this is inconsistent with the normal trajectory, most of her symptoms are self-reported, and her level of activity was inconsistent with the impairments she claimed.

25.     Unum's main rationale supporting termination of benefits seems to be that although Proctor was disabled when it first approved benefits, she is now no longer disabled because she is not improving as one would expect.  The plain language of the Policy, however, makes clear that disability is evaluated solely by the claimant's limitations, not what might be typical or a normal trajectory.  While the normal trajectory surely informs the analysis as it is medical evidence, the disability decision must remain focused on the claimant and her limitations.  This is so even if the symptoms worsen over time and even if most people would have shown an improvement in symptoms.  *See Chapman v. Unum Life Ins. Co. of Am.*, 555 F. Supp. 3d 713, 725 (D. Minn. 2021) (noting that even if the majority of people follow a particular medical path, it does not mean the claimant will).  Despite this and findings by its own reviewers such as by Dr. Black that Proctor continued to show cognitive abnormalities, (AR 1387–88), Unum relied on the typical progression, rather than Proctor's progress to deny Proctor's continuing claim.

26.     Unum's termination explanation is also not fully supported in the record. For example, Unum claimed that cognitive complaints developed seven weeks after the

accident. (AR 1693.) Unum, however, provides no evidence of this and the record shows Proctor began reporting difficulties concentrating on the day of the accident and cognitive problems were again found ten days after the accident. (AR 355.)

27.    While it is true that much of the evidence supporting Proctor's claim are self-reported symptoms, the Policy specifically allows for self-reported symptoms to be considered and even to form the primary basis for a disability at least for the first twenty-four months. (AR 152.) Unum also appears to have relied largely on such evidence when it originally granted benefits, undercutting its argument against using it now. *Cf. Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 526 (8th Cir. 2021) ("Sun Life accepted Roehr's records as proof of a qualifying disability and then later, without expressing any concerns to Roehr, used essentially the same records to find Roehr failed to establish an ongoing, qualifying disability. While Roehr bears the burden of proving entitlement to benefits, this Court has explained that a plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on 'substantial evidence.'"). Moreover, the Court finds Proctor's reports generally credible based on the record before it.

28.    Although Proctor is active in some ways, this activity does not appear to be inconsistent with her impairments. Crucially, the type of activity she is typically engaging in does not indicate that she can complete the duties of her occupation. For example, she engages in volunteer work, but that work—where she can work at her own pace for

short periods of time—does not indicate she can complete the duties of her previous occupation.

29.    Two other considerations also support a finding that Proctor remained disabled.  First, no one who has personally examined Proctor has cleared her to work full-time or in her previous occupation including those who examined her in January and August 2020.  The most she was cleared to work by someone who personally examined her was for two hours per day on three nonconsecutive days a week.  Unum's reviewers, who concluded she could work, never personally examined her, instead relying on paper reviews.  Unum's Claims Manual suggests that the opinions of providers who actually examined a claimant carry great weight and should only be rejected with specific reasons explaining why the provider's opinion is not well supported.  (Leighton Decl., Ex. B.)  Although Unum's reviewers reach different conclusions and provide explanations for their reasons, they do not fully address why they disagree with Proctor's providers.  Instead, the reviewers largely just claim it is inconsistent with the typical course for similar injuries and inconsistent with her level of activity without providing specific reasons why her progression could not be atypical or why her activity is consistent with her occupation.  Moreover, Unum could have required Proctor to be examined in person if it so chose and as often as it was reasonable to do so.[5]  (AR 146.)

---

[5] Unum seems to blame Proctor for the fact that it never completed an in-person examination, noting she never requested one during her appeal.  (*See* AR 2000.)  The Policy, however, makes clear that Unum—not Proctor—could require this examination.

30.    Second, this is a termination of benefits case.  In a termination of benefits case, "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."  *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002).  This does not shift the burden to Unum; it is instead just a consideration.  *See id.*  There may have been some improvement in Proctor's vestibular and vision deficits which were the basis of granting her disability in the first place.  Another doctor, however, found continuing vision problems.  And there is no evidence of cognitive improvements, significant decreases in headaches, or decreases in her photosensitivity including from screens or troubles reading that would make it difficult to complete the duties of her occupation.  As her symptoms and much of the other evidence remained largely consistent, the available information did not alter in some significant way.

31.    Unum contends that this in effect punishes Unum for granting benefits while it investigated Proctor's claim.  In some cases, allowing an administrator to conduct an investigation is a valid rationale for granting and then terminating benefits even though there was no improvement or change in a claimant's capacity.  *See Kecso v. Meredith Corp.*, 480 F.3d 849, 854 (8th Cir. 2007)  Here, however, Unum provided benefits for more than a year before terminating them.  Unum also was not simply working through conflicting information and investigating during this time; it affirmatively found

she was disabled.  Together, these facts show that this is not such a case.  *See Werb v. ReliaStar Life Ins. Co.*, No. 13-0669, 2014 WL 2881468, at *10 (D. Minn. June 25, 2014); *see also Kecso*, 480 F.3d at 854 ("[T]the record suggests that [the administrator] simply agreed to pay [long-term disability] benefits to [the claimant] while it sought to reconcile the conflicting medical information by obtaining all of [the claimant's] relevant medical records.").

32.     Ultimately whether Proctor was disabled on January 29, 2020, turns on the substantial duties of her occupation.  These required, among other things, "Constant keyboard use;" "Near acuity, far acuity, depth perception and accommodation;" and "Influencing people in their opinions, attitudes, and judgments."  (AR 709.)  The record indicates she struggles to type emails, to maintain her concentration on computer screens, to find words and put sentences together, and she still had various visual limitations including with depth perception.  These specific limitations would render her unable to complete these tasks.  These limitations in connection with her other limitations—including her headaches and cognitive difficulties—demonstrate that by a preponderance of the evidence Proctor could not have completed the material and substantial duties of her regulation occupation as of January 29, 2020.

33.     Because she could not complete the material and substantial duties of her occupation, Proctor was disabled under the Policy as of January 29, 2020.  Therefore, Unum wrongfully terminated her benefits.

34.     Because Unum wrongfully terminated her benefits, the Court will grant Proctor's Motion, deny Unum's Motion, and order Unum to reinstate her benefits.  The Court will also order Unum to reinstate benefits through Proctor's twenty-four-month regular occupation period because Unum does not contest that this is an appropriate remedy if the Court determines that Proctor met her burden under the regular occupation standard.  Here, there is no evidence in the record that demonstrates a significant improvement after January 29, 2022, but before the Policy's disability standard switched to "any gainful occupation."

35.     The Court, however, expresses no view as to whether Proctor was disabled or still is disabled under the any gainful occupation standard once the twenty-four months ran on the regular occupation standard.  Unum and Proctor have also not expressed their opinions on this, and both agree that if the Court finds Proctor has met her burden under the regular occupation standard, Unum should evaluate Proctor under the any gainful occupation standard.  Therefore, the Court will remand to Unum to determine in the first instance whether Proctor is disabled under the any gainful occupation standard, if it so chooses.

**B.      Benefits During Remand**

36.     Although the parties agree that Unum should decide whether she is disabled under the any gainful occupation standard on remand, the parties disagree about what should happen in the meantime.  Proctor contends Unum should pay benefits after the end of the twenty-four-month regular occupation period and continue to pay

benefits at least until it makes a final determination as to whether Proctor is still disabled under the any gainful occupation standard.  Unum contends that the payment of benefits should be confined to the twenty-four-month regular occupation period and then only if it is later determined that Proctor remained disabled under the any gainful occupation standard should it pay additional benefits.

37.     In ERISA actions like this case, courts may clarify "rights to future benefits under the terms of the plan" meaning that the Court is authorized to issue orders related to future payments, not just back-benefits.  *See* 29 U.S.C. § 1132(a)(1)(B); *Welsh v. Burlington N., Inc., Emp. Benefits Plan*, 54 F.3d 1331, 1339–40 (8th Cir. 1995).

38.     The parties cite numerous cases in support of their respective positions. These cases, however, are distinguishable from this case.  For example, in *Christoff v. Unum Life Insurance Company*, the standard remained a "regular occupation" standard, meaning that there was not the same natural break where the administrator was permitted to evaluate the claimant under a new standard as there is here.  No. 17-3512, 2019 WL 4757884, at *1–2, 5, 8 (D. Minn. Sept. 30, 2019).  On the other hand, in *Hantakas v. Metro. Life Insurance Co.*, the court did not award ongoing benefits under the "any occupation" standard because the claimant never applied for benefits under that standard, suggesting the claimant had an affirmative duty to do so when the standard changed.  No. 14-235, 2016 WL 374562, at *7 (E.D. Cal. Feb. 1, 2016); *see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long-term Disability Income Plan*, 85 F.3d 455, 460

(9th Cir. 1996) (noting that the plaintiff never applied for benefits under a "total disability" standard when rejecting paying ongoing benefits after the standard switched).

39.     Here, however, the Policy includes no language requiring a claimant to specifically reapply when the standard changes or at any other time.  Nor does a claimant have an ongoing, proactive duty to prove or provide evidence that she or he remains entitled to benefits after Unum makes a disability determination.  Instead, the best interpretation of the Policy as an integrated whole indicates that payments stop either (1) when a claimant is "no longer disabled under the terms of the plan" on the appropriate standard, (AR 152), and Unum affirmatively makes this determination, (AR 146), or (2) when a claimant fails to submit proof of continuing disability, (AR 152), after Unum requests this proof, (AR 134).  Thus, benefits continue indefinitely at least until Unum acts in one of two forms.  First, benefits could end if Unum affirmatively considers whether, determines that, and explains why Proctor is not disabled under the any gainful occupation standard based on the evidence it already has.  Second, benefits could end if Unum requests additional information from Proctor and either Proctor fails to provide it or, after receiving the new information, Unum determines that considering all the evidence she is not disabled under the any gainful occupation standard.  Unum has done neither.  So, under the terms of the Policy, Proctor should continue to receive benefits.

40.     Because Proctor did not have an ongoing duty to prove her disability and the burden is on Unum to make a determination or request proof of an ongoing disability

-43-

and it has not done so, the Court will award Proctor ongoing benefits until Unum

determines—if it does so—in the first instance whether Proctor is disabled under the any

gainful occupation standard. *See Ray v. UNUM Life Ins. Co. of Am.*, 224 F. App'x 772, 781

(10th Cir. 2007).

41.     In addition to being consistent with the Policy language, this determination

is consistent with the equitable nature of this remedy. If the Court does not award back

and ongoing benefits, Proctor would now have a duty to prove she was still disabled after

January 29, 2020, and has continued to be disabled for more than two years. This would

be unfair to Proctor and would require her to reconstruct medical records for more than

two years. *See Cook v. Liberty Life Assur. Co. of Bos.*, 320 F.3d 11, 24–25 (1st Cir. 2003) ("It

would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to

update her former insurance company and the court on her disability during the

pendency of her internal appeals and litigation, on the off chance that she might prevail

in her lawsuit.").

42.     To be clear, Unum may immediately—or at any time in the future—begin

its process to determine whether Proctor is still disabled under the Policy's any gainful

occupation standard as the result of the car accident. *See Welsh v. Burlington N., Inc.,*

*Emp. Benefits Plan*, 54 F.3d 1331, 1340 (8th Cir. 1995); *Halpin v. W.W. Grainger, Inc.*, 962

F.2d 685, 697 (7th Cir. 1992). But until it determines she is disabled under that standard,

Unum must pay Proctor the benefits owed under the Policy.

-44-

C.      **Attorney Fees and Costs**

43.      Because the Court finds that Unum improperly terminated her benefits, the

Court must determine whether to award Proctor her attorney fees and costs in pursuing

this action as she requests.

44.      ERISA provides that "the court in its discretion may allow a reasonable

attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  The decision

to award attorney fees and costs is discretionary but when making the decision to award

fees, a court should consider ERISA's remedial nature and "apply its discretion consistent

with the purposes of ERISA, those purposes being to protect employee rights and to

secure effective access to federal courts."  *Starr v. Metro Systems, Inc.*, 461 F.3d 1036,

1040 (8th Cir. 2006) (quoting *Welsh*, 54 F.3d at 1331).  "Therefore, although there is no

presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails

to receive fees."  *Id.* at 1040–41.

45.      The Eighth Circuit has provided a list of five non-exclusive factors for courts

to consider:

> (1) the degree of culpability or bad faith of the opposing party;
> (2) the ability of the opposing party to pay attorney fees; (3)
> whether an award of attorney fees against the opposing party
> might have a future deterrent effect under similar
> circumstances; (4) whether the parties requesting attorney
> fees sought to benefit all participants and beneficiaries of a
> plan or to resolve a significant legal question regarding ERISA
> itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 495–96 (8th Cir. 1984); *accord Starr*, 461 F.3d at

1041.  No one factor is dispositive.  *See Starr*, 461 F.3d at 1041.  The factors should not be

mechanically applied and instead are general guidelines.  *Martin v. Arkansas Blue Cross &*

*Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002) (en banc).

46.      The Court will award Proctor her reasonable attorney fees and costs in

bringing this action.  Although Unum may have genuinely concluded that Proctor was not

disabled and may in fact be correct, Unum's main explanation for this conclusion was that

although Proctor had been disabled and there was no evidence her symptoms had

improved, she must not be disabled because her progression was atypical.   This

explanation, however, is inconsistent with the Policy's plain language which requires an

individualized analysis.   Moreover, although Unum asserted that her activities were

inconsistent with her symptoms, it never properly explained why these activities were

consistent with the duties of her occupation.   Nor did it explain why its conclusions—

made solely based on paper reviews when it had the opportunity to personally evaluate

Proctor—were more reliable than the evaluations of Proctor's in-person providers who

continued to find her disabled and did not question the veracity of her symptom reports.

This lack of explanation indicates Unum did not exercise the care required of it in the

administrative process.

47.      An award is also consistent with the remedial nature of ERISA.  Failing to

award fees here would discourage future claimants who have been wrongfully denied

-46-

benefits from challenging that determination, decreasing access to courts. For a similar reason, awarding fees will have a deterrent effect on other administrators faced with similar records to either make a different decision or to investigate the continued nature of a claimant's symptom reports more thoroughly even if that progression is atypical.

48. The Court, however, requires evidence supporting Proctor's reasonable attorney fees and costs before it can make a final award and will order Proctor to submit an affidavit substantiating her fees and costs. The parties, however, must meet and confer before this is filed in an attempt to resolve any differences on the reasonableness of the fees and costs.

### D. Prejudgment Interest

49. Because the Court finds that Unum improperly terminated her benefits, the Court must also determine whether to award Proctor her prejudgment interest as she requests.

50. Although ERISA does not expressly provide for prejudgment interest, prejudgment interest awards are permitted by 29 U.S.C. § 1132(a)(3)(B) which allows a court to award "other appropriate equitable relief" in ERISA cases. *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1006 (8th Cir. 2004). Whether to award prejudgment interest is discretionary. *Lutheran Med. Ctr. of Omaha v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan*, 25 F.3d 616, 623 (8th Cir. 1994). Despite this, a court should award prejudgment interest unless exceptional or unusual circumstances exist making the award of interest inequitable." *Id.* (quotation omitted).

51.    The main purpose of prejudgment interest is to prevent a wrongdoer from profiting from wrongdoing.  *Id.* at 1009.  Other purposes include to compensate the prevailing party and promote settlements.  *Christianson v. Poly-Am., Inc. Med. Ben. Plan*, 412 F.3d 935, 941 (8th Cir. 2005).

52.    The Court will award Proctor prejudgment interest.  There are not exceptional or unusual circumstances that would make this award inequitable.  Unum has been able to invest the benefits owed to Proctor and failing to award interest would encourage administrators to deny benefits as, even if they lose the case, they would still retain the time-value of money.  This has also been denied to Proctor.

53.    Although the Court will award prejudgment interest, it will not resolve the amount of interest at this time.  Proctor acknowledges that the Eighth Circuit has approved of using the post-judgment interest rate from 28 U.S.C. § 1961 for pre-judgment interest.  *See Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1331 (8th Cir. 1995).  Still, Proctor argues setting a higher amount would be more equitable with no explanation for why this is so.  Unum does not address the proper interest rate at all.  Therefore, the Court will direct the parties to file short briefs on the proper interest rate including calculating the interest owed under the methods they discuss.  The parties, however, must meet and confer before this is filed in an attempt to resolve any differences on the proper prejudgment interest.

**ORDER FOR JUDGMENT**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED AND DECLARED** that:

1. Defendant's Motion for Judgment on the Administrative Record [Docket No. 14] is **DENIED**.

2. Plaintiff's Motion for Judgment on the Administrative Record [Docket No. 21] is **GRANTED**.

3. Defendant is ordered to pay Plaintiff damages in the amount of all her unpaid long-term disability benefits from the date of termination to the present, in an amount to be determined.

4. Defendant is ordered to resume Plaintiff's long-term disability benefits until it determines that Plaintiff is not disabled under the "any gainful occupation" standard as defined in the Policy or until the Policy otherwise permits termination of benefits.

5. Plaintiff's request for reasonable attorney fees, costs, and prejudgment interest is granted.

6. The parties are ordered to meet and confer to discuss the amount of benefits owed, the reasonableness of Plaintiff's attorney fees and costs, and the proper calculation of prejudgment interest.

7. If the parties agree on the amounts, the parties shall submit a joint proposed judgment within 28 days after entry of this Order.

8.  If the parties disagree:

    a.  Plaintiff shall submit an affidavit substantiating her attorney fees and

        costs incurred in this matter and a brief explaining her positions on the

        benefits owed and on prejudgment interest including calculating the

        interest owed within 28 days after entry of this Order; and

    b.  Defendant may submit a response to Plaintiff's attorney fees and costs

        affidavit and a brief explaining its positions on the benefits owed and on

        prejudgment interest including calculating the interest owed within 14

        days after Plaintiff submits her filings.

DATED:  September 29, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge

-50-